UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------- X
JANET RAY WEININGER,                 :
                                     :   05 Civ. 7214 (VM)
                    Plaintiff,       :
                                     :
     -  against  -                   :   **DECISION AND ORDER**
                                     :
FIDEL CASTRO, et al.,                :
                                     :
                    Defendants.      :
--------------------------------X

**VICTOR MARRERO, United States District Judge.**

## Table of Contents

                                                          **Page**

**I.    BACKGROUND** ........................................ **3**

A.   THE WEININGER JUDGMENT ............................  3

B.   THE McCARTHY JUDGMENT .............................  9

C.   JPM CHASE'S CROSS-MOTION FOR RELIEF IN THE
     NATURE OF INTERPLEADER ............................ 12

**II.  STANDARD OF REVIEW** ............................... **13**

**III. DISCUSSION** ........................................ **13**

A.   ENFORCEABILITY OF THE WEININGER AND
     McCARTHY JUDGMENTS ................................ 18

     1.   The Full Faith and Credit Doctrine ........... 21

     2.   Recognition by Other Courts .................. 36

B.   TRIA SECTION 201(a) ............................... 37

     1.   Subject Matter Jurisdiction .................. 38

     2.   TRIA § 201(a) ................................ 41

          a.   A Judgment Against a Terrorist Party .... 42

    b.    A Claim Based on an Act of Terrorism
          Or a Claim for Which the Terrorist
          Party Is Not Immune under § 1605(a)(7)...   43

    c.    Blocked Assets .........................   45

    d.    Compensatory Damages ...................   45

    e.    Execution Upon the Assets of an Agency
          or Instrumentality of a Terrorist Party..   46

_____(i) Placing TRIA in Context in the FSIA..   47

          (ii) The Effect of TRIA upon Bancec ......   52

  3.    Subject Matter Jurisdiction through
        Ancillary Jurisdiction .....................   65

  4.    Personal Jurisdiction ......................   69

  5.    Whether the Assets Belong to Agencies or
        Instrumentalities of Cuba ..................   77

        i.    The EMTELCUBA Account ..................   78

        ii.   The AT&T Long Lines Account ............   83

        iii.  The Rabinowitz Boudin Account ..........   84

C.   TURNOVER PURSUANT TO CPLR § 5225(b) ..............   89

D.   JPM CHASE'S MOTION FOR INTERPLEADER RELIEF .......   91

  1.    Interpleader Relief ........................   91

  2.    Attorney's Fees and Costs ..................   95

IV.  ORDER ...........................................   97

Plaintiffs Janet Ray Weininger ("Weininger") and Dorothy Anderson McCarthy ("McCarthy") (collectively, "Plaintiffs") each filed motions for partial summary judgment for turnover orders pursuant to Federal Rules of Civil Procedure 13 and 69 and New York Civil Practice Law and Rules ("CPLR") § 5225(b). Defendant JPMorgan Chase Bank, N.A. ("JPM Chase") opposed Plaintiffs' motions for summary judgment and cross-moved for discharge in interpleader, as well as discharge pursuant to CPLR §§ 5209 and 5239.[1]  Adverse claimant-respondents AT&T Corp. ("AT&T") and Cuban American Telephone and Telegraph Company ("CATT"), a wholly-owned subsidiary of AT&T, opposed JPM Chase's cross-motion for discharge in interpleader to the extent that such motion requested discharge of funds that AT&T and CATT claimed were the sole property of AT&T and/or CATT. The Court has reviewed the submissions from Plaintiffs, JPM Chase, AT&T and CATT, the amicus curiae submission from the Cuban Electric Company ("CEC"), and a letter dated January 6, 2006 from the U.S. Department of Justice, expressing the position of the United States in this matter.[2]

---

[1] JPM Chase characterizes its opposition to Plaintiffs' motions as a "response" rather than an opposition, presumably so as to not to jeopardize its status as a neutral stakeholder under interpleader doctrine.

[2] See Letter to Judge Victor Marrero from Beth Goldman, Assistant United States Attorney, dated January 6, 2006 ("DOJ Ltr."), attached as Ex. O to Declaration of James W. Perkins in Support of Motion for Partial Summary Judgment for Turnover Order Purusant to Fed. R. Civ. P. 13 and 69 and CPLR § 5525(b), dated Feb. 6, 2006 ("Perkins Decl.").

Plaintiffs seek an order directing turnover of certain funds held by garnishees JPM Chase and Rabinowitz, Boudin, Standard, Krinsky & Lieberman, P.C., ("Rabinowitz Boudin") (collectively, "Garnishees"). Specifically, Plaintiffs seek turnover of funds in the following accounts: (i) AT&T Long Lines (Account No. G00875) (hereinafter the "AT&T Long Lines Account") (of which CATT claims ownership of $6,332,843.49, which amount (and interest thereon) has been voluntarily exempted by Petitioners from the scope of the requested order); (ii) Rabinowitz Boudin Republic of Cuba (Account No. 092-6371190) (hereinafter the "Rabinowitz Boudin Account"); and (iii) Empresa de Telecomunicaciones de Cuba (Account No. 395-507995) (hereinafter the "EMTELCUBA Account") (collectively the "Accounts").[3] The funds sought were blocked by the United States pursuant to the Cuban Assets Control Regulations ("CACR"), 31 C.F.R. Part 515, as authorized by Trading with the Enemy Act, 50 U.S.C. App. §§ 1-44, as sanctions against Cuba in response to the expropriation of Americans' property in Cuba.

None of the judgment debtors has appeared at any stage of

---

[3] McCarthy had also sought turnover from certain accounts at JPM Chase listing Banco Nacional de Cuba as "owner." However, in response to submissions by JPM Chase indicating that material issues of fact exist as to whether these accounts are owned by Banco Nacional de Cuba, Plaintiffs have indicated that for purposes of the present motion, Plaintiffs no longer seek turnover from those accounts. (See Joint Mem. of Plaintiffs in Reply to JPMorgan Chase's Response Mem. and to Amicus Curiae Brief Filed by Cuban Electric Company, dated Apr. 14, 2006 ("Pls. Reply Mem."), at 3 n.2.)

these proceedings. Additionally, Rabinowitz Boudin has not appeared in this action.

## I.   **BACKGROUND**[4]

### A.   THE WEININGER JUDGMENT

Weininger, invoking amendments to the Foreign Sovereign Immunities Act ("FSIA") that removed the immunity of foreign countries from suits in United States courts for certain state-sponsored wrongful conduct, see 28 U.S.C. § 1605(a)(7), obtained a default judgment in Florida state court against the Republic of Cuba, Fidel Castro, Raul Castro, and the Army of the Republic of Cuba. Weininger's Florida action was grounded on the death of her father, Thomas Willard Ray, who was killed by Cuban soldiers during events surrounding the Bay of Pigs invasion by Cuban exiles and their supporters in 1961. Weininger's default judgment was rendered by the Circuit Court

---

[4] The factual recitation below is taken from the parties' submissions in support of and in opposition to Plaintiffs' and JPM Chase's motions, as well as the various attachments accompanying these documents, including: Plaintiffs' Janet Ray Weininger and Dorothy Anderson McCarthy's Joint Rule 56.1 Statement in Support of Motion for Partial Summary Judgment, dated Feb. 6, 2006 ("R.56.1 Statement"); Declaration of James W. Perkins in Support of Motion for Partial Summary Judgment for Turnover Order Pursuant to Fed. R. Civ. P. 13 and 69 and CPLR § 5525(b), dated Feb. 6, 2006 ("Perkins Decl."); Declaration of Joseph A. DeMaria, Esq. in Support of Motion for Partial Summary Judgment, dated Feb. 6, 2006 ("DeMaria Decl."); Reply Declaration of James W. Perkins in Support of Motion for Partial Summary Judgment for Turnover Order Pursuant to Fed. R. Civ. P. 13 and 69 and CPLR § 5525(b), dated Apr. 14, 2006 ("Perkins Reply Decl."); Rule 56.1 Statement of JPMorgan Chase Bank, N.A. in Limited Opposition to Plaintiffs' Joint Motions for Partial Summary Judgment, dated Mar. 10, 2006 ("JPM Chase R. 56.1 Statement"); Declaration of James Kerr, dated March 10, 2006 ("Kerr Decl."); Supplemental Declaration with Respect to Service, dated May 2, 2006 ("Kerr Suppl. Decl."). Except where specifically cited or quoted, no further reference to these documents will be made.

for the Eleventh Judicial Circuit in and for Miami-Dade County (the "Florida Circuit Court") on June 15, 2005. See Weininger v. Castro, No. 03-22920 CA 20 (Fla. Cir. Ct., 11th Cir., Miami-Dade Cty., June 15, 2005) ("Weininger Judgment") (attached as Ex. B to Perkins Decl.).   The amount of compensatory damages awarded by Weininger's judgment is $23,939.301.95, including interest through December 27, 2005.

Weininger commenced the instant litigation in state court by seeking summary judgment in lieu of complaint to domesticate the Florida state court judgment.   On August 1, 2005, Weininger obtained an attachment order in New York State Supreme Court, New York County, directing the Sheriff of the City of New York to levy upon property held at JPM Chase as Garnishee in which the judgment debtors have an interest, naming specifically the three accounts mentioned above.  On or about August 4, 2005, the sheriff levied upon JPM Chase, and in response, on August 11, 2005, JPM Chase served its garnishment statement pursuant to CPLR § 6219.   In that statement, JPM Chase indicated that none of the accounts on its books had been opened in the name of any of the judgment debtors, but that the three specified accounts represented deposit debts owed to "agencies or instrumentalities" of the Republic of Cuba, and that the Republic of Cuba "may have an indirect or contingent interest" in the accounts.   (Letter

-4-

from JPM Chase to Sheriff, dated Aug. 11, 2005 ("JPM Chase Garnishee Statement"), attached as Ex. A to Perkins Decl.) JPM Chase further indicated that all such accounts were blocked pursuant to the Cuba Assets Control Regulations, 31 C.F.R. Part 515.

JPM Chase removed the action to federal court on August 12, 2005, and on September 8, 2005 filed a third-party petition for interpleader relief against Weininger, McCarthy, and various other parties whom JPM Chase alleged may have an interest in the accounts.  In particular, JPM Chase named (1) Rabinowitz Boudin in its capacity as alleged fiduciary in respect of the blocked Rabinowitz Boudin Account; (2) Banco Nacional de Cuba ("Banco Nacional"); (3) Empresa Cubana Exportadora de Alimentos y Productos Varios ("CUBAEXPORT"); (4) Empresa de Telecomunicaciones Internacionales de Cuba ("EMTELCUBA"); (5) Empresa de Radiocomunicacion y Difusion de Cuba ("RADIOCUBA"); (6) Empresa de Telecomunicaciones de Cuba SA ("ETECSA") (7) AT&T; and (8) CATT.[5]  JPM Chase served a summons, notice of petition and third-party petition on each of these adverse claimants.   AT&T and CATT were served pursuant to agreement with counsel. (See Kerr Suppl. Decl. ¶¶ 19, 36.)  Rabinowitz Boudin was served by hand on October 5,

_____

[5] JPM Chase had also named the United States Treasury Secretary as an adverse claimant-respondent due the Government's blocking of the deposits, but pursuant to a stipulation so-ordered by the Court on December 21, 2005, dismissed the Secretary without prejudice.

-5-

2005.  (<u>See</u> Kerr Suppl. Decl. ¶¶ 17, 34.)  After being served with JPM Chase's interpleader petition, Rabinowitz Boudin twice requested additional time to respond, first until October 31, 2005, then until November 4, 2005, and the parties so stipulated.  (<u>See</u> Kerr Suppl. Decl. ¶¶ 18, 35.)  To date, no response has been made by Rabinowitz Boudin to JPM Chase's petition.

JPM Chase served the alleged agencies and instrumentalities of Cuba, or entities sited only in Cuba (such as ETECSA), pursuant to § 1608(b)(3)(B) of the FSIA by causing the summons, notice of petition, and third-party petition, in English and Spanish, to be sent by the Clerk of Court by registered mail, return receipt requested, for delivery by the United States Postal Service.  (<u>See</u> Kerr Suppl. Decl. ¶¶ 7-11, 26-29.)  JPM Chase indicates that it supplemented this service, at least with respect to Banco Nacional, ETECSA, and RADIOCUBA, by DHL Worldwide Express through the Clerk of Court.  (<u>See</u> Kerr Suppl. Decl. ¶¶ 13-16, 30-33, Exs. A(6), A(7), A(8), B(5), B(6), B(7), attached to same.)

JPM Chase also served these papers on the defendants in the underlying Weininger and McCarthy actions -- <u>i.e.</u>, the Republic of Cuba, Fidel Castro, Raul Castro, and the Army of the Republic of Cuba -- by causing the summons, notice of

petition, and third-party petition in English and Spanish to be sent by the Clerk of Court by registered mail, return receipt requested, for delivery by the United States Postal Service. (See Kerr Suppl Decl. ¶¶ 7, 12, 25, 29, Exs. A(4), A(5), B(3), B(4)). From the Supplemental Declaration alone it is unclear whether JPM Chase also served these judgment debtors by DHL: the exhibits indicate that JPM Chase requested that the Clerk of Court effect DHL service upon the defendants in the underlying action, and that DHL service was made upon "Ministerio de Relaciones Exteriores, Attention: Felipe Perez Roque, Ministro," but it is unclear which of the named judgment debtors or other agencies and instrumentalities this service may refer to. (See Kerr Suppl. Decl. ¶¶ 13-16, 30-33, Exs. A(6), A(7), A(8), B(5), B(6), B(7), attached to same.) However, the Court notes that JPM Chase has attempted to effect service of all papers in this litigation upon these judgment debtors by addressing these judgment debtors at such address.

Weininger commenced a proceeding in this Court on November 2, 2005 against JPM Chase seeking turnover of the funds pursuant to the order of attachment. Weininger does not indicate that she served the judgment debtors with these papers pursuant to the FSIA, but instead provided notice according to CPLR § 5225(b) by serving copies by DHL. (See

-7-

Perkins Decl. ¶ 12.)  By Order dated December 13, 2005, this Court consolidated Weininger's attachment proceeding that had been removed to this court, Chase's third-party petition, Weininger's turnover proceeding, and McCarthy's petition described below.  By consent of the parties, Weininger's turnover petition was deemed, pursuant to Federal Rules of Civil Procedure 13 and 18, to have been filed as a counterclaim to JPM Chase's third-party petition for interpleader relief.

In addition, by Order dated December 13, 2005, this Court granted Weininger's motion for summary judgment in lieu of complaint domesticating the Florida state court judgment in New York, ordering that Weininger's Florida judgment, "including all of the findings of fact and conclusions of law therein, ... is entitled to full faith and credit in New York" and directing the Clerk of Court to enter judgment as provided in the Florida judgment. (Docket No. 71.)  On December 27, 2005, this Court entered a writ of execution with respect to Weininger's judgment.

On January 9, 2006, Weininger also filed a cross-claim against Rabinowitz Boudin for turnover of the funds in the Rabinowitz Boudin Account at JPM Chase.  (See Perkins Decl. ¶ 17.)  Weininger served Rabinowitz Boudin by hand and mailed

copies to the judgment debtors by DHL.  (See id. ¶ 18.)[6]

Weininger now moves for a turnover order directing the Garnishees to relinquish funds from the Accounts.  In response, JPM Chase cross-moved for interpleader relief.  JPM Chase served its cross-motion for interpleader relief by DHL Air Mail upon ETECSA, EMTELCUBA, CUBAEXPORT, the Army of the Republic of Cuba, the Republic of Cuba, Raul Castro, Fidel Castro, RADIOCUBA, Banco Nacional.  It served the same upon Rabinowitz Boudin by Express Mail.  (See Kerr Suppl. Decl. ¶¶ 39-40; Exs. C(1), C(2).)

B.   THE MCCARTHY JUDGMENT

McCarthy's judgment is based on a claim against the Republic of Cuba arising from the execution of her husband, Howard F. Anderson ("Anderson"), by a Cuban firing squad shortly after his conviction by a "Revolutionary Tribunal" for allegedly acting as a liaison for an anti-communist group and conspiring to smuggle weapons to anti-Castro forces in Cuba.

---

[6] Weininger had earlier attempted to effect service in this action on the Republic of Cuba by service upon Rabinowitz Boudin, referring to such firm as "Attorneys for the Republic of Cuba," but by letter dated October 14, 2005, Rabinowitz Boudin informed this Court that it did not represent the Republic of Cuba in this litigation and could not accept service on behalf of the Republic of Cuba.  (See Letter from Rabinowitz Boudin to Judge Marrero, dated Oct. 14, 2005 (Docket No. 30).)  The Court received an additional letter dated October 27, 2005 from Rabinowitz Boudin indicating that Weininger had attempted to serve the Cuban parties in this case in part by service on the Cuban Interests Section of the Embassy of Switzerland and the Permanent Mission of the Republic of Cuba to the United Nations, and that such entities were not authorized to accept service on behalf of any of the Cuban entities.  Weininger's cross-claim, however, is directed at Rabinowitz Boudin in its capacity as fiduciary holding property of the judgment debtors in the Rabinowitz Boudin Account.

See <u>McCarthy v. Republic of Cuba</u>, No. 01-26628 CA 04 (Fla. Cir. Ct., 11th Cir., Miami-Dade Cty., April 17, 2003) ("McCarthy Judgment") (attached as Ex. A to DeMaria Decl.). The Florida Circuit Court issued a final order authorizing entry of default judgment against the Republic of Cuba on April 17, 2003, and awarded compensatory damages to Anderson's estate and family in the aggregate amount of $67 million.  <u>See id.</u> at 12-17.

McCarthy subsequently brought an action on the judgment in the United States District Court for the Southern District of Florida.  On February 2, 2005, that court entered a final default judgment against the Republic of Cuba.  (<u>See</u> DeMaria Decl., Ex. B., at 4-5.)  On May 22, 2005, McCarthy registered that federal judgment with this Court pursuant to 28 U.S.C. § 1963.  (<u>See</u> DeMaria Decl. ¶ 5; Ex. F.)  On August 22, 2005, the judge sitting in Part I in this Court granted an order authorizing issuance of a writ of execution for McCarthy to levy upon the Republic of Cuba's property in this district for the purposes of satisfying the registered judgment.

On September 2, 2005, the United States Marshal served Rabinowitz Boudin and JPM Chase with a writ of execution levying upon the EMTELCUBA, AT&T Long Lines, and Rabinowitz

Boudin Accounts.[7]

Separately, McCarthy sought to enforce the federal registered judgment in the New York Supreme Court.  On August 24, 2005, that court held that the FSIA did not preclude enforcement of the Florida state and federal court judgments and granted McCarthy's motion to execute upon the judgment against the Republic of Cuba.  See McCarthy v. Republic of Cuba, 800 N.Y.S. 2d 906, 909 (Sup. Ct. N.Y. Co. 2005).

As indicated above, JPM Chase's third-party petition was filed against McCarthy, among others.  In response to JPM Chase's third-party petition, on November 14, 2005 McCarthy filed a counter-petition for turnover, asserted against both JPM Chase and Rabinowitz Boudin in their capacity as garnishees, seeking turnover of funds in those accounts. McCarthy served Rabinowitz Boudin by hand.  (See Docket No. 104, Ex. 3 (Affidavit of Service).)  In addition, McCarthy served her turnover petition in accordance in accordance with the FSIA upon the Republic of Cuba, as well as the various Cuban entities identified by Chase in its papers (including Banco Nacional, EMTELCUBA, RADIOCUBA, ETECSA, and CUBAEXPORT), by serving copies in both English and Spanish by DHL through the Clerk of Court.  (See R.56.1 Statement ¶ 40; DeMaria Aff.

---

[7] This writ of execution also levied upon accounts under the name of Banco Nacional.  As indicated earlier, however, for purposes of the present motion Plaintiffs no longer seek to execute upon those accounts.

¶ 9; Docket No. 104.).  As indicated, these actions were consolidated before this Court.  McCarthy now moves for turnover of assets in those accounts.

C.   JPM CHASE'S CROSS-MOTION FOR RELIEF IN THE NATURE OF INTERPLEADER

JPM Chase asserts that as a result of the Plaintiffs' actions to execute against the Accounts, it is exposed to "inconsistent legal obligations and to the risk of double or multiple liability."  (Mem. of Law in Response to Motion for Partial Summary Judgment on Claims for Turnover and in Support of Cross-Motion for Relief in the Nature of Interpleader, dated Mar. 10, 2006 ("JPM Chase Mem."), at 2.)  JPM Chase commenced third-party proceedings in order to bring all adverse claimants to the blocked deposits before the Court and to obtain a discharge in interpleader and as a garnishee under CPLR §§ 5209 and 5239.

JPM Chase seeks an order from the Court that will (a) determine whether JPM Chase is to be required to comply with the turnover order sought by Plaintiffs; (b) incorporate findings intended to protect any turnover order from collateral attack, and (c) discharge JPM Chase from any further liability to any present or future adverse claimants-respondents, with respect to the accounts subject to turnover. JPM Chase also seeks reimbursement for its expenses in seeking interpleader relief.

## II.   **STANDARD OF REVIEW**

To prevail on a motion for summary judgment, the moving party must demonstrate that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The Court ascertains which facts are material by considering the substantive law of the action, for only those "facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). Even if a dispute over material facts exists, summary judgment may be granted unless the dispute is "genuine," i.e., "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party."  Id. at 249.  In determining whether genuine issues of material fact exist, "[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor."  Id. at 255 (citing Adickes v. S.H. Kress & Co., 398 U.S. 144, 158-59 (1970)).

## III.   **DISCUSSION**

The property in the United States of a foreign state and its agencies and instrumentalities is generally immune from execution under the FSIA unless a specific exception applies pursuant to the FSIA.  See 28 U.S.C. § 1609; FG Hemisphere

-13-

<u>Assocs., LLC v. Republique du Congo</u>, 455 F.3d 575, 584 (5th Cir. 2006); <u>DeLetelier v. Republic of Chile</u>, 748 F.2d 790, 793 (2d Cir. 1984).   Conversely, federal courts lack subject matter jurisdiction over enforcement proceedings against the property of a foreign state unless a statutory exception to immunity applies.   <u>See</u> <u>Verlinden B.V. v. Central Bank of Nigeria</u>, 461 U.S. 480, 489 (1983); <u>FG Hemisphere</u>, 455 F.3d at 584; <u>DeLetelier</u>, 748 F.2d at 793.[8]  Plaintiffs seek to execute judgments against property in the United States of the Republic of Cuba ("Cuba") and certain alleged agencies and instrumentalities of Cuba.   Accordingly, the Court must determine whether any statutory exception to immunity from execution applies to permit execution in this proceeding.

As set forth below, the Court concludes that Section 201(a) of the Terrorism Risk Insurance Act of 2002, Pub. L. No. 107-297, 116 Stat. 2322, ("TRIA") provides an exception to immunity from execution over the funds in question.

Before reaching the question of TRIA's applicability to the Weininger and McCarthy judgments, the Court will first examine the question raised by JPM Chase and CEC regarding whether the Weininger and McCarthy judgments are entitled to

_____

[8] The Court notes that some courts have also found jurisdiction over enforcement proceedings through ancillary jurisdiction to enforce a judgment where the foreign sovereign has already been found not immune from jurisdiction under the FSIA, and then determine whether a statutory exception to immunity from execution upon the particular property applies. This theory is discussed below.

enforcement by this Court.  CEC argues that the judgments are unenforceable because the Florida state courts that rendered the judgments purportedly lacked subject matter and personal jurisdiction under the FSIA, while JPM Chase suggests that the judgments may be unenforceable on such ground.  As discussed below, the Court is not persuaded that the judgments are unenforceable on account of the alleged jurisdictional deficiencies of the Florida state courts.

The Court first makes several preliminary observations.

It is beyond question that this Court must satisfy itself that it has jurisdiction to rule on any question it needs to decide that resolves the merits of a dispute.  This unremarkable and fundamental principle is reflected in countless precedents as well as in the special status accorded subject matter jurisdiction in the Federal Rules of Civil Procedure, which allow the subject matter jurisdiction of a court to be raised at any time, even by the court on its own initiative.  See Fed. R. Civ. P. 12(h)(3).  What makes this case unique is the question of the extent to which such inquiry into the Court's own subject matter jurisdiction should encompass probing further back in the jurisdictional chain to examine the authority of a prior court, the judgment of which this Court is called upon to authorize execution, especially where, preceding the matter before this Court,

-15-

other courts took intermediate actions that recognized or assumed the validity of the underlying judgments without review of the subject matter jurisdiction of the court which rendered the judgments.

To be sure, attacks on a prior court's jurisdiction, both subject matter and personal, are routinely made and obligate the later court to consider the challenge. Such an inquiry generally arises after a default judgment is rendered, when the party who won the judgment seeks to enforce it. The party who defaulted in the first proceeding will then collaterally attack the judgment, arguing that the rendering court lacked jurisdiction, and thus that he or she should not be bound. Here, however, the question is posed without any collateral attack by the parties against whom the judgment is sought to be enforced. Instead, the jurisdictional question is raised by a third party serving as amicus curiae, as well as by a garnishee seeking not to void the judgment but merely to obtain interpleader relief.

In the absence of any collateral attack, what governs this Court's obligation defining how far back in the decisional line it need go in ascertaining the propriety of the jurisdictional issues now before it and its own authority to rule? Stated differently, what duty does this Court have on its own motion to reexamine the jurisdictional competence,

-16-

and resultant factual and legal determinations, of courts
preceding it in the decisional order that also were under
similar obligation to confirm their authority as a predicate
to rendering a judgment on the merits, and how deeply into the
record of these extensive proceedings need this Court probe?

In this case, there have already been two levels of
review.  First, the Florida state courts determined their
jurisdiction.  Nor was such determination implicit or cursory,
as might have been the case in the entry of a routine default
judgment.  Instead, because § 1608(e) of the FSIA bars entry
of default against a foreign state unless the claimant
establishes a claim or right to relief "by evidence
satisfactory to the court," 28 U.S.C. § 1608(e), the Florida
courts whose judgments are at issue here held hearings, took
evidence, satisfied themselves of their jurisdiction and
expressly so ruled.

Then, in the McCarthy case, a Florida federal district
court held that the state court judgment was entitled to full
faith and credit. Those same judgment debtors were served and
failed to appear, and the federal court made an implicit
determination of jurisdiction -- both its own and the state
court's -- and found the judgment entitled to be enforced.  In
the Weininger case, this Court granted summary judgment in
lieu of complaint recognizing the Florida judgment, finding it

-17-

entitled to full faith and credit, and thus implicitly recognizing both its own and the Florida state court's jurisdiction after service upon the judgment debtors who again failed to appear.

Even now, in these enforcement proceedings, neither the judgment debtors nor the other entities which JPM Chase has impleaded and whose alleged assets are at risk of loss, have appeared, despite notice, to contest the validity of the judgments or that such judgments should be enforced against them.  Under these circumstances, the policies and principles underlying res judicata doctrine would make it manifestly inequitable for this Court to reopen the judgments so as to permit a challenge to the underlying adjudication at the request of parties not affected by the judgments, and in particular at the behest of a party who appears as amicus here by the grace of the Court.

A.   <u>ENFORCEABILITY OF THE WEININGER AND MCCARTHY JUDGMENTS</u>

JPM Chase and CEC assert that the Weininger and McCarthy judgments are unenforceable against the judgment debtors because the Florida state courts that rendered judgment erred in determining that FSIA § 1605(a)(7) ("§ 1605(a)(7)") provided jurisdiction over the judgment debtors.  The FSIA provides the sole basis for obtaining jurisdiction over a foreign state or an agency or instrumentality of a foreign

state.  See Saudi Arabia v. Nelson, 507 U.S. 349, 355 (1993); Argentine Republic v. Amerada Hess Shipping Corp., 488 U.S. 428, 434 (1989); Verlinden, 461 U.S. at 488-89.  Unless one of the exceptions to immunity from jurisdiction set forth in the FSIA applies, a foreign state and its agencies and instrumentalities are immune from the subject matter jurisdiction of federal and state courts.  See Saudi Arabia, 507 U.S. at 355; Verlinden, 461 U.S. at 488-89; Zappia Middle East Constr. Co. v. Emirate of Abu Dhabi, 215 F.3d 247, 250-51 (2d Cir. 2000).  Pursuant to the FSIA, a court acquires personal jurisdiction over a foreign state or instrumentality of a foreign state where the court has subject matter jurisdiction pursuant to the FSIA and where service has been made on the foreign state or instrumentality as specified by FSIA § 1608.  See 28 U.S.C. § 1330(b).

JPM Chase and CEC argue that the Florida state courts erroneously determined that the FSIA provided subject matter jurisdiction over the judgment debtors in the state court proceedings.  As noted above, the Florida state courts held, after requisite fact-finding proceedings, that jurisdiction over the named defendants in the Weininger and McCarthy state court actions arose under § 1605(a)(7).  That provision states that a foreign state is not immune from the jurisdiction of state and federal courts in the United States where "money

-19-

damages are sought against a foreign state for personal injury
or death that was caused by an act of torture [or]
extrajudicial killing."   28 U.S.C. § 1605(a)(7).   However,
that section further provides that a court "shall decline to
hear a claim under this paragraph ... if the foreign state was
not designated as a state sponsor of terrorism under section
6(j) of the Export Administration Act of 1979 (50 U.S.C. App.
2405(j)) or section 620A of the Foreign Assistance Act of 1961
(22 U.S.C. 2371) at the time the act occurred, unless later so
designated as a result of such act."   28 U.S.C. §
1605(a)(7)(A).   JPM Chase and CEC question the state courts'
finding of jurisdiction pursuant to that section, noting that
Cuba was not designated as a state sponsor of terrorism under
those statutes at the time of the incidents giving rise to the
Weininger and McCarthy judgments, and contending that although
Cuba was later so designated, such designation was not "as a
result of" the incidents giving rise to the judgments.   In
response, Plaintiffs argue first that the full faith and
credit doctrine bars the Court from re-examining the issue of
the jurisdiction of the prior courts at this stage in the
proceeding.   Plaintiffs also contend that the Florida state
court judgments are no longer assailable because subsequent
courts, e.g., the United States District Court for the
Southern District of Florida, the New York Supreme Court, as

-20-

well as this Court, have already acknowledged the validity of the state court judgments.   Each of these arguments is addressed below.

1.   <u>The Full Faith and Credit Doctrine</u>

Plaintiffs argue that the judgments sought to be enforced in this proceeding must be recognized as valid pursuant to the requirements of full faith and credit.   According to that doctrine, codified in the Full Faith and Credit Act, "the judicial proceedings of any court of any such State . . . shall have the same full faith and credit in every court within the United States . . . as they have by law or usage in the courts of such State . . . from which they are taken."   28 U.S.C. § 1738.   Under this statute, a federal court that is asked to recognize a state court judgment is obligated to give the same preclusive effect to that judgment as would the courts of the rendering state.   See <u>Migra v. Warren City Sch. Dist.</u>, 465 U.S. 75, 81 (1984); <u>Kremer v. Chemical Constr. Corp.</u>, 456 U.S. 461, 482 (1982); <u>Underwriters Nat'l Assurance Co. v. North Carolina Life & Accident Health Ins. Guar. Ass'n</u>, 455 U.S. 691, 704 & n.9 (1982); <u>Stone v. Williams</u>, 970 F.2d 1043, 1053-54 (2d Cir. 1992).[9]

---

[9] The Court notes that at least with respect to the Weininger judgment, which was previously domesticated by this Court, the Court is not directly faced with enforcing a "foreign" judgment, but rather with its own judgment.   Nonetheless, it may be appropriate here to reexamine whether there is any constitutional infirmity with that judgment.

Ordinarily, in assessing whether to enforce a state court judgment, a federal court must engage in a two-step inquiry. See McCloud v. Lawrence Gallery, Ltd., No. 90 Civ. 30, 1991 WL 136027, at *4 (S.D.N.Y. July 12, 1991).  First, pursuant to the full faith and credit doctrine, the court is obliged to enforce the judgment only to the extent that the courts of the rendering state would be similarly bound. See id.  "Hence, if the state courts would entertain a collateral attack on the judgment, so may the federal courts." Id. at *4; see Johnson v. Muelberger, 340 U.S. 581, 587 (1951) (holding that a collateral attack is barred "where the party attacking would not be permitted to make a collateral attack in the courts of the granting state").

The second step arises from the recognition that these full faith and credit principles are subject to "some basic limitations" -- "[c]hief among these limitations is the caveat, consistently recognized by this Court, that 'a judgment of a court in one State is conclusive upon the merits in a court in another State only if the court in the first State had power to pass on the merits -- had jurisdiction, that is, to render the judgment.'" Underwriters, 455 U.S. at 704 (quoting Durfee v. Duke, 375 U.S. 106, 110 (1963)).  Thus, because neither federal nor state courts may enforce a "constitutionally infirm judgment," see Kremer, 456 U.S. at

482-83, "before a court is bound by the judgment rendered in another State, it may inquire into the jurisdictional basis of the foreign court's decree. If that court did not have jurisdiction over the subject matter or the relevant parties, full faith and credit need not be given." <u>Underwriters</u>, 455 U.S. at 705; <u>McCloud</u>, 1991 WL 136027, at *5.  <u>See</u> <u>Conopco, Inc. v. Roll Int'l</u>, 231 F.3d 82, 60 n.7 (2d Cir. 2000) (describing two-part analysis required under Full Faith and Credit Act as "(1) whether, under federal law, the judgment is entitled to full faith and credit; and (2) what preclusive effect would the judgment be given under the law of the rendering state"); <u>American Steel Bldg. Co. v. Davidson & Richardson Constr. Co.</u>, 847 F.2d 1519, 1521 (11th Cir. 1988) ("The full faith and credit statute thus requires a two-tiered analysis: first, we must consider whether the original court had jurisdiction, thus entitling the judgment to full faith and credit; and second, we must determine how much credit the judgment is entitled to receive.").[10]

With regard to the first step in the inquiry, a federal court is required to examine the state court's res judicata law to determine whether a collateral attack would be

---

[10] The Court notes that <u>McCloud</u> engages in these steps in reverse of the order suggested by <u>Conopco</u> and <u>American Steel</u>.  <u>Underwriters</u> does not dictate a particular order and accordingly the Court sees no harm in following the order suggested in <u>McCloud</u>, as long as both inquiries are made.

permitted.   Where such an attack would be permitted under state law, the federal court must permit such an attack in an enforcement proceeding.   See Johnson, 340 U.S. at 587; McCloud, 1991 WL 136027, at *4-*5.  However, this analysis is not entirely applicable here, where no judgment debtor has made a collateral attack.   While the judgment debtors had numerous opportunities to challenge the state court judgments, either directly, by appealing the judgments, or collaterally, through a motion to vacate for lack of jurisdiction, a suit for declaratory relief, or in the numerous subsequent proceedings to domesticate and federalize the judgments in New York and Florida or in this proceeding seeking execution, the judgment debtors have failed to interpose any collateral attack.  The judgment debtors' failure to collaterally attack the judgments works as a "double default" and renders the first step of the court's full faith and credit inquiry, that of whether a collateral attack would be permissible under state court law, unnecessary.  In the absence of a collateral attack, a Florida state court would be bound to enforce the judgments, except to the extent that such court were to find them constitutionally infirm, as discussed below.

The second step in a federal court's inquiry into the enforceability of a foreign court's judgment is whether there is a constitutional infirmity with the foreign court judgment.

See <u>Kremer</u>, 456 U.S. at 482 ("The State must ... satisfy the applicable requirements of the Due Process Clause.  A State may not grant preclusive effect in its own courts to a constitutionally infirm judgment, and other state and federal courts are not required to accord full faith and credit to such a judgment."); <u>Underwriters</u>, 455 U.S. at 705; <u>McCloud</u>, 1991 WL 136027, at *5.  Accordingly, a federal court may examine whether the rendering court lacked jurisdiction over the judgment sought to be enforced.  See <u>Underwriters</u>, 455 U.S. at 705.

Nonetheless, "principles of preclusion apply equally to jurisdictional matters." <u>Stone</u>, 970 F.2d at 1057.  "It has long been the rule that principles of res judicata apply to jurisdictional determinations -- both subject matter and personal." <u>Ins. Corp. of Ireland, Ltd. v. Compagnie des Bauxites de Guinee</u>, 456 U.S. 694, 702 n.9 (1982); <u>see</u> <u>also</u> <u>Underwriters</u>, 455 U.S. at 706.  Thus, "'a judgment is entitled to full faith and credit -- even as to questions of jurisdiction -- when the second court's inquiry discloses that those questions have been fully and fairly litigated and finally decided in the court which rendered the original judgment.'" <u>Underwriters</u>, 455 U.S. at 706 (<u>quoting</u> <u>Durfee</u>, 375 U.S. at 111); <u>see</u> <u>American Steel</u>, 847 F.2d at 1521; <u>McCloud</u>, 1991 WL 136027, at *5.  The same preclusive effect

-25-

occurs where a party had an opportunity to litigate jurisdiction but chose not to do so:  "A party that has had an opportunity to litigate the question of subject-matter jurisdiction may not ... reopen that question in a collateral attack upon an adverse judgment." Ins. Corp., 456 U.S. at 702 n.9; see United States v. Bigford, 365 F.3d 859, 865 (10th Cir. 2004) ("[A]s long as a party had an opportunity to litigate the jurisdictional issue, it is not subject to collateral attack."); Corbett v. MacDonald Moving Servs., Inc., 124 F.3d 82, 88-89 (2d Cir. 1997); A.L.T. Corp. v. Small Bus. Admin., 801 F.2d 1451, 1460 n.17 (5th Cir. 1986); Nemaizer v. Baker, 793 F.2d 58, 65 (2d Cir. 1986) ("[I]f the parties could have challenged the court's power to hear a case, then res judicata principles serve to bar them from later challenging it collaterally.") (emphasis in original).

However, where a judgment is rendered by default, it is not always clear whether such an opportunity to contest any jurisdictional deficiency actually existed.  Certainly as to personal jurisdiction, default judgments do not foreclose collateral attacks.  See Ins. Corp., 456 U.S. at 706 ("A defendant is always free to ignore the judicial proceedings, risk a default judgment, and then challenge that judgment on jurisdictional grounds in a collateral proceeding."); Transaero, Inc. v. La Fuerza Aerea Boliviana, 162 F.3d 724,

730 (2d Cir. 1998) ("A court entering a default judgment may assume that it has jurisdiction over the defendant when the defendant does not appear in court to contest the judgment, but that assumption does not preclude the defendant from later contesting jurisdiction in the enforcing court. Thus, any determination by the [district court] that service was proper and that it had personal jurisdiction under the FSIA when it entered the initial default judgment in 1989 cannot be deemed final and preclusive on these questions.") (citations omitted); see also Bigford, 365 F.3d at 865 (observing that there is no opportunity to litigate a personal jurisdiction issue in a default proceeding); American Steel, 847 F.2d at 1521 ("[W]here the defendant does not appear, and judgment is by default, the state court judgment does not preclude the federal court from reviewing the jurisdictional issues."). But cf. ALT Corp., 801 F.2d at 1460 n.17 (stating, on appeal of a default judgment, that the state court "[a]rguably ... fully and fairly considered the issue of personal jurisdiction when it recited ALT's compliance with Texas service of process requirements," but declining to give preclusive effect to subject matter jurisdiction where the record did not indicate that the state court even considered questions of subject matter jurisdiction); McCloud, 1991 WL 136027, at *12 n.8 (suggesting that the res judicata effect of a default judgment

on a jurisdictional question appears to be an unsettled question).[11]

However, each of the preceding cases involved a collateral attack by the judgment debtor, or presumptive party to the underlying action, who had sufficient standing to pursue an appeal or collateral attack on the underlying judgment. Here, there is no collateral attack by the judgment debtors. No judgment debtor has appeared to argue that it did not have an opportunity to contest the rendering court's subject matter jurisdiction or personal jurisdiction and that the judgments are void on that basis. While CEC objects to this Court's enforcement of the judgment, it does not have standing to bring a collateral attack upon the judgment.[12]  A garnishee such as JPM Chase may have standing to either directly or collaterally attack a judgment.  <u>See</u> <u>FG Hemisphere</u>, 455 F.3d at 584 (allowing sovereign immunity of foreign state to be directly raised by garnishee on appeal);

---

[11] Plaintiffs have suggested that Florida law applies res judicata to bar collateral attacks on default judgments, although the case law they cite is less than conclusive on this point, and moreover, this proposition elides the second step of the two-part full faith and credit inquiry.

[12] "The term 'amicus curiae' means friend of the court, not friend of a party. We are beyond the original meaning now; an adversary role of an amicus curiae has become accepted. But there are, or at least there should be, limits." <u>Ryan v. Commodity Futures Trading Comm'n</u>, 125 F.3d 1062, 1063 (7th Cir. 1997) (Posner, J., in chambers) (citations omitted). Seeking on behalf of a non-appearing party to void a judgment already so exhaustively prosecuted, with the judgment debtors provided with ample notice and opportunity to appear at each stage, should be one of those limits.

Thompson v. Liberty Mut. Ins. Co. of Boston, 390 F.2d 24, 26 (10th Cir. 1968) ("The garnishee may properly show that the judgment sued upon is not valid for jurisdictional reasons."). Yet, JPM Chase has not collaterally attacked the underlying judgments here, and it concedes that it does not oppose the relief requested by Plaintiffs.  (See Kerr Decl. ¶ 5 ("TRIA may provide to plaintiffs the execution they seek.  JPM Chase does not oppose that relief."))[13]   Instead, displaying the better part of somewhat Falstaffian valor, JPM Chase merely invites the Court to undertake that inquiry of the Court's own accord.  Even the United States, which had been a party to this suit, is monitoring the case, and has expressed its views through a letter to the Court, has not expressed the position that Plaintiffs' state court judgments should not be enforced. Compare Roeder v. Islamic Republic of Iran, 195 F. Supp. 2d 140, 159-60 (D.D.C. 2002) (vacating a default judgment against Iran in response to Rule 60(b)(4) motion by intervenor United States, who argued that rendering court lacked subject matter jurisdiction because Iran had not been designated a state sponsor of terrorism as a result of the acts in question).

---

[13] In this regard, JPM Chase's argument here walks a very fine line.  It declares that it does not oppose such relief, yet simultaneously demands that Plaintiffs demonstrate both subject matter jurisdiction in this proceeding and in the underlying Florida state court proceedings, and in fact maintains that reexamination of subject matter jurisdiction in the underlying proceedings is barred by res judicata.  (See Kerr Decl. ¶¶ 6-7.)

The parties have not pointed to any authority <u>requiring</u> this Court to sua sponte engage in an analysis of the subject matter jurisdiction of the rendering court in the absence of a collateral attack by the party against whom the judgment is to be enforced or another party in interest such as the United States, and the Court declines to do so.  <u>See</u> <u>Underwriters</u>, 455 U.S. at 705 ("[B]efore a court is bound by the judgment rendered in another State, it <u>may</u> inquire into the jurisdictional basis of the foreign court's decree.") (emphasis added); <u>cf.</u> <u>McClearn v. Cowen & Co.</u>, 660 F.2d 845, 849 (2d Cir. 1981) (noting that the court "may" on its own motion set aside a void judgment).  At this late stage of these complex and lengthy proceedings, the judgment debtors have had ample opportunity to contest the jurisdictional issues but chose not to do so.  Similarly, numerous state and federal courts that encountered the same questions raised here either asserted jurisdiction or exercised discretion not to reopen those settled matters.  Under these circumstances, insofar as the choice now before this Court offers sufficient latitude for the exercise of discretion, it would be acutely inequitable for this Court to assume the task of such a renewed jurisdictional inquiry on its own initiative.

Nor would enforcement of these judgments under these circumstances be so clearly wrong that it would comprise a

violation of some constitutional principle.  In this regard, it bears repeating that the Florida state courts did not simply enter default but instead were obligated to comply with with FSIA § 1608(e), which requires that "[n]o judgment by default shall be entered by a court of the United States or of a State against a foreign state, a political subdivision thereof, or an agency or instrumentality of a foreign state, unless the claimant establishes his claim or right to relief by evidence satisfactory to the court."  28 U.S.C. § 1608(e).  Accordingly, the state courts conducted a hearing and took evidence before finding that subject matter jurisdiction existed.  (See Pls. Reply Mem. at 21 n.15 (discussing evidence placed before the Florida state courts, including expert submissions); McCarthy Judgment at 5-7; Weininger Judgment at 4, 5-7.)

While those hearings may have entailed the submissions of only one side, in the absence of a collateral attack contesting the sufficiency of the evidence presented to establish jurisdiction, it is not appropriate at this stage for this Court on its own motion to review those findings. Moreover, the Florida state court examined its jurisdiction as required by FSIA § 1608(e) and found an arguable basis for jurisdiction that is entitled to presumptive validity, absent a sufficiently compelling challenge by the judgment debtors or

-31-

other party with enough standing to intervene on their behalf. Even if some colorable ground to charge error on the part of the state court were to be introduced at this point, under the circumstances prevailing here, this Court discerns no basis to support a finding that the state courts' judgments represent such a plain usurpation of power to warrant this Court taking it upon itself to reexamine the state courts' findings and defeat the compelling interest in repose for matters settled after extensive litigation. This course holds true particularly in a case in which the record demonstrates that the defendant was given notice and afforded multiple opportunities to contest the courts' exercise of jurisdiction and elected not to do so. See Cantor Fitzgerald, L.P., v. Peaslee, 88 F.3d 152, 155 n.2 (2d Cir. 1996) ("[A] judgment rendered by a court assuming subject-matter jurisdiction and sustained on direct appeal is entitled to preclusive effect as long as the District Court did not 'plainly usurp jurisdiction' over the action."); Nemaizer, 793 F.2d at 65 (in context of Rule 60(b)(4) motion, "[s]ince a court has power to determine its own jurisdiction and, in fact, is required to exercise that power sua sponte, it does not plainly usurp jurisdiction when it merely commits an error in the exercise of that power. Rather, a court will be deemed to have plainly usurped jurisdiction only when there is a 'total

want of jurisdiction' and no arguable basis on which it could
have rested a finding that it had jurisdiction."); 18A Wright,
Miller & Cooper, <u>Federal Practice & Procedure</u> § 4428 at 15-16
(2d ed. 2002) ("So long as the court that entered judgment can
assert personal jurisdiction over the defendant, it may fairly
claim   the   right   to   determine   its   own   subject-matter
jurisdiction.  This claim should be honored unless the lack of
jurisdiction   is   so   clear   that   a   second   court   can   act   to
protect the defendant against the imposition of any burden by
a manifestly powerless tribunal and to defeat a judgment that
offers no plausible basis for repose.").

      CEC   also   asserts   that   the   state   courts   erred   in
determining that the courts had personal jurisdiction over the
judgment debtors pursuant to the FSIA.   Under the FSIA,
personal jurisdiction is achieved where the court has subject
matter jurisdiction pursuant to the FSIA and service has been
made on the foreign state under FSIA § 1608.  <u>See</u> 28 U.S.C. §
1330(b); <u>Verlinden</u>, 461 U.S. at 485 n.5 ("§ 1330(b) provides
personal   jurisdiction   wherever   subject   matter   jurisdiction
exists under subjection (a) and service of process has been
made under § 1608 of the Act.").   CEC's challenge is based
entirely on the first prong of FSIA personal jurisdiction --
the finding of subject matter jurisdiction.   As explained
above, insofar as this Court possesses discretion to do so

-33-

under the circumstances governing this case, it chooses not to reopen consideration of subject matter jurisdiction.

Finally, the Court concludes that enforcement of the judgments is not precluded by any other constitutional infirmity. A federal court may not enforce a judgment that is constitutionally defective because it was entered in violation of the defendant's due process rights. See Kremer, 456 U.S. at 482-83. This rule permits the enforcing court to decline enforcement not only on the basis of lack of jurisdiction, as discussed above, but also "if the procedures utilized in the original forum were in other respects so deficient as to reflect an absence of due process." McCloud, 1991 WL 136027, at *17 (citing Fehlhaber v. Fehlhaber, 681 F.2d 1015, 1027-29 (Fifth Cir. Unit B 1982)). The Court concludes that the due process rights of the judgment debtors were not violated in the Florida Circuit Court.

There is no dispute that the judgment debtors were served in the state court proceedings in accordance with the requirements of the FSIA. Accordingly, reopening the state courts' determinations would not be appropriate here. Reexamination would entail, in an essentially ex parte proceeding here, a reconsideration of the factual record before the state courts and a new determination as to whether the evidence before those courts supported the courts'

-34-

conclusion.  "The insufficiency of evidence in support of a claim is not, in itself, a basis for a collateral due process attack on a judgment."  McCloud, 1991 WL 136027, at *17.  "Were it otherwise, the enforcing court would inevitably be required to reexamine the merits of the original controversy, which is plainly not proper in an enforcement proceeding."  Id. (citing Ultracashmere House, Ltd. v. Madison's of Columbus, Inc., 534 F. Supp. 542, 544 n.5 (S.D.N.Y. 1982)).  "This principle is even more pertinent in a case where the defendant has defaulted in the original proceeding."  Id.  See Boddie v. Connecticut, 401 U.S. 371, 378 (1971) (holding that due process does not require a hearing where defendant defaults, but merely notice and opportunity to be heard).  Here, where there is no collateral attack by the judgment debtors, it is especially inappropriate for the Court to re-examine the record from the original controversy.  Furthermore, as discussed below, the judgments have been adopted by numerous subsequent courts, making reopening of the issue at this juncture even more inappropriate.

CEC argues that this Court has an obligation to raise sua sponte and decide the issue of subject matter jurisdiction.  While this Court must consider whether it has subject matter jurisdiction in connection with the proceeding immediately before it, that is a separate issue from the

question of whether the state courts that rendered the underlying judgments had subject matter jurisdiction that should now be assessed anew. As explained below, the Court concludes that TRIA Section 201(a) provides subject matter jurisdiction in this proceeding.

### 2.    Recognition by Other Courts

There have been intervening court decisions recognizing the validity of Plaintiffs' judgments. As to Weininger's, this Court has already recognized that such judgment, as well as "all of the findings of fact and conclusions of law therein," are entitled to full faith and credit. (Order, dated Dec. 13, 2005 (Docket No. 71).)    As to McCarthy's state judgment, a federal district court in Florida has already recognized that judgment and entered a default against the judgment debtors in respect of it. Moreover, a state court in New York has recognized it as well, after concluding that the FSIA did not preclude enforcement of the Florida judgment.[14] No evidence of constitutional infirmity in the records of the proceedings in the courts that authorized these judgments has been called to this Court's attention.

---

[14] The arguments which that court faced are different from those presented here. The New York Supreme Court authorized execution upon the judgment on the theory that (1) the Florida federal judgment had been registered in this Court, and CPLR § 5018(b) explicitly permits direct entry of a judgment rendered or filed by a federal district court in New York as a judgment of the New York state court; and (2) Cuba had received proper notice of the Florida federal default judgment under the FSIA. See id. at 908-09. Nonetheless, the New York state court did recognize the judgment, providing further reason for this Court to not re-open the issue.

Accordingly, a variant of the "last in time" rule provides further reason for this Court to decline to re-open the matter of the validity of the Florida state court judgments. <u>See</u> 18A Wright, Miller & Cooper, <u>Federal Practice & Procedure</u> § 4428 at 34 (2d ed. 2002) ("[T]he 'last in time' rule applies as well to determinations of the consequences of jurisdictional failure as to other matters.  There can be little question that a ruling by a second court that a prior judgment cannot be attacked for lack of jurisdiction is binding.  So too, a final ruling by a second court that a prior judgment can be ignored for lack of jurisdiction is binding even though it disregards all sound principle.") (<u>citing</u> <u>Treinies v. Sunshine Mining Co.</u>, 308 U.S. 66, 78 (1939)).

B.   <u>TRIA SECTION 201(a)</u>

As set forth below, the Court concludes that:  (1) this Court has subject matter jurisdiction over the enforcement action before it pursuant to TRIA § 201(a); (2) TRIA § 201(a) permits execution against funds held by or owed to the Republic of Cuba; (3) TRIA § 201(a) permits execution against funds held by or owed to those entities that are agencies and instrumentalities of a foreign state as defined by the FSIA; and (4) Banco Nacional is not exempt from TRIA § 201(a) as a result of its status as a central bank.

### 1. Subject Matter Jurisdiction

The FSIA is the exclusive source of subject matter jurisdiction over all civil actions against foreign states or their agencies and instrumentalities. See Saudi Arabia, 507 U.S. at 355; Argentine Republic, 488 U.S. at 434; Robinson v. Government of Malaysia, 269 F.3d 133, 138 (2d Cir. 2001); Zappia, 215 F.3d at 250-51. "[S]ubject-matter jurisdiction in any such action depends on the existence of one of the specified exceptions to foreign sovereign immunity." Verlinden, 461 U.S. at 493. Accordingly, "'[a]t the threshold of every district court action against a foreign state, the court must satisfy itself that one of the exceptions [to immunity] applies [because its] subject matter jurisdiction ... depends on that application.'" FG Hemisphere, 455 F.3d at 584 (quoting Republic of Austria v. Altmann, 541 U.S. 677, 691 (2004)); see Verlinden, 461 U.S. at 493-94; Robinson, 269 F.3d at 139; NYSA-ILA Pension Trust Fund ex rel. Bowers v. Garuda Indonesia, 7 F.3d 35, 39 (2d Cir. 1993) ("Before a federal court may apply ... any ... rule of law in a case involving a foreign state or instrumentality of that state, it must, as a threshold matter, find an exception to the FSIA's grant of sovereign immunity."). Even if a party fails to enter an appearance and assert its claim of immunity, a court must determine whether immunity is available pursuant to the FSIA.

See Verlinden, 461 U.S. at 493 n.20 ("[S]ubject matter jurisdiction turns on the existence of an exception to foreign sovereign immunity.  Accordingly, even if the foreign state does not enter an appearance to assert an immunity defense, a District Court still must determine that immunity is unavailable under the Act.") (citation omitted); Brewer v. Socialist People's Republic of Iraq, 890 F.2d 97, 101 (8th Cir. 1989).

Under § 1604 of FSIA, a foreign state is immune from the jurisdiction of federal or state courts unless one of the statutory exceptions to immunity found in §§ 1605-07 applies. See 28 U.S.C. § 1604; Verlinden, 461 U.S. at 488; Shapiro v. Republic of Bolivia, 930 F.2d 1013, 1017 (2d Cir. 1991).  In the context of an enforcement proceeding, § 1609 renders the property in the United States of a foreign state immune from execution or attachment, including garnishment, unless §§ 1610-11 provide otherwise.  See 28 U.S.C. § 1609 ("[T]he property in the United States of a foreign state shall be immune from attachment arrest and execution except as provided in sections 1610 and 1611 of this chapter.");[15] FG Hemisphere, 455 F.3d at 584; Alejandre v. Telefonica Larga Distancia de

---

[15]  The term "attachment in aid of execution" was intended to include attachments, garnishments, and supplemental proceedings available under federal or state law to obtain satisfaction of a judgment.  See H.R. No. 94-1487, at 28 (1976), reprinted in 1976 U.S.C.C.A.N. 6604, 6627; Alejandre v. Telefonica Larga Distancia de Puerto Rico, Inc., 183 F.3d 1277, 1283 (11th Cir. 1999).

<u>Puerto Rico, Inc.</u>, 183 F.3d 1277, 1283 (11th Cir. 1999);

<u>DeLeletier</u>, 748 F.2d at 793 ("[U]nder § 1609 foreign states

are immune from execution upon judgments obtained against

them, unless an exception set forth in §§ 1610 or 1611 of the

FSIA applies."). Accordingly, to exercise subject matter

jurisdiction in this action, this Court must find that a

statutory exception to immunity exists under the FSIA. As set

forth below, the Court finds that TRIA § 201(a) provides an

exception to immunity in this garnishment action, and hence

confers subject matter jurisdiction over this enforcement

action. <u>See</u> <u>FG Hemisphere</u>, 455 F.3d at 595 ("A finding that

an exception to executional immunity applies is a finding that

the court has jurisdiction over the garnishment action.").[16]

---

[16] Plaintiffs mistakenly suggest that the FSIA does not apply to any
determination of jurisdiction -- subject matter or personal -- over this
matter because "the FSIA jurisdictional provisions only address cases in
which the foreign sovereign is a party ... [and] pursuant to Rule 69, Fed.
R. Civ. P., this Court has authority to exercise jurisdiction here under
the rules and procedures applicable under New York law, and those rules
allow jurisdiction under quasi in rem principles where the Court has
jurisdiction over garnishees holding property against which execution is
allowed in satisfaction of the judgment." (Pl. Reply Br. at 12).
Plaintiffs both conflate subject matter and personal jurisdiction and
confuse jurisdiction with procedure. Rule 69 does not create jurisdiction
or authorize jurisdiction pursuant to state law jurisdiction principles.
<u>See</u> <u>U.S.I. Props. Corp. v. M.D. Constr. Co.</u>, 230 F.3d 489, 498 n.8 (1st
Cir. 2000) ("The incorporation of state enforcement procedures through
Rule 69 is not alone sufficient to create federal jurisdiction over such
enforcement proceedings. The fact that Rule 69(a) may (by way of state
law) afford procedural mechanisms for enforcing an existing federal
judgment against a third party not otherwise liable does not obviate the
need to establish the jurisdiction of the federal court over the
supplemental proceeding. The Federal Rules of Civil Procedure can neither
expand nor limit the jurisdiction of the federal courts, and the issue of
jurisdiction remains distinct from the question of procedure.") (citations
omitted); <u>Kashi v. Gratsos</u>, 712 F. Supp. 23, 25 (S.D.N.Y. 1989) ("[Rule
69] does no more than establish a system of procedure for federal district
courts. Neither this rule nor state law create or withdraw the district
court's jurisdiction to enforce its judgment."); <u>see</u> <u>also</u> Fed. R. Civ. P.

Alternatively, as set forth below, at least with respect to the judgment debtors, this Court has subject matter jurisdiction through ancillary jurisdiction to enforce a judgment.

    2.  <u>TRIA § 201(a)</u>

In November 2002, Congress enacted TRIA.  Section 201(a) of TRIA provides:

> Notwithstanding any other provision of law, and except as provided in subsection (b),[17] in every case in which a person has obtained a judgment against a terrorist party on a claim based upon an act of terrorism, or for which a terrorist party is not immune under section 1605(a)(7) of title 28, United States Code, the blocked assets of that terrorist party (including the blocked assets of any agency or instrumentality of that terrorist party) shall be subject to execution or attachment in aid of execution in order to satisfy such judgment to the extent of any compensatory damages for which such terrorist party has been adjudged liable.

TRIA § 201(a), codified at 28 U.S.C. § 1610 note.

Thus, TRIA allows for execution on the blocked assets of a terrorist party, or its agency or instrumentality, to satisfy a judgment against the terrorist party, provided that the following requirements are met:

    (1) a person has obtained a judgment against a terrorist

---

82 ("These rules shall not be construed to extend or limit the jurisdiction of the United States district courts."); <u>Owen Equip. & Erection Co. v. Kroger</u>, 437 U.S. 365, 370 (1978) ("[I]t is axiomatic that the Federal Rules of Civil Procedure do not create or withdraw federal jurisdiction").

[17] Subsection (b) addresses diplomatic property and is not applicable to this case.

party;

(2) the judgment is either

    (a) for a claim based on an act of terrorism, or

    (b) for a claim for which a terrorist party is not immune under § 1605(a)(7);

(3) the assets are "blocked assets" within the meaning of TRIA; and

(4) execution is sought only to the extent of any compensatory damages.

In addition, as indicated, and important to this case, by its terms § 201 provides that the blocked assets that may be executed upon are those of either the "terrorist party" <u>or</u> "any agency or instrumentality of that terrorist party," even though the judgment itself need be only against the terrorist party.  The Court will examine each of these elements in turn.

    a.  <u>A Judgment Against a Terrorist Party</u>

TRIA defines "terrorist party" to mean

    a terrorist, a terrorist organization (as defined in section 212(a)(3)(B)(vi) of the Immigration and Nationality Act (8 U.S.C. 1182(a)(3)(B)(vi))), or a foreign state designated as a state sponsor of terrorism under section 6(j) of the Export Administration Act of 1979 (50 U.S.C. App. 2405(j)) or section 620A of the Foreign Assistance Act of 1961 (22 U.S.C. 2371).

TRIA § 201(d)(4), codified at 28 U.S.C. § 1610 note.

In 1982, Cuba was designated by the State Department as a state sponsor of terrorism under Section 6(j) of the Export

-42-

Administration Act of 1979, 50 U.S.C. App. § 2405(j).  <u>See</u> Clarification for Foreign Policy Export Controls, 47 Fed. Reg. 16,623 (Apr. 19, 1982).  It therefore falls within TRIA's definition of "terrorist party."  <u>See</u> § 201(d)(4).  Therefore, Plaintiffs have each obtained a judgment against a terrorist party, a prerequisite to execution under TRIA.

> b.  <u>A Claim Based on an Act of Terrorism or a Claim for Which the Terrorist Party Is Not Immune under § 1605(a)(7)</u>

As indicated, to execute under TRIA, Plaintiffs must have a judgment against a terrorist party either for (a) a claim based on an act of terrorism, <u>or</u> (b) a claim for which a terrorist party is not immune under § 1605(a)(7).  In Part III.A above, this Court concluded that the Florida state courts already determined that Cuba was not immune from judgment under § 1605(a)(7), and that this Court would decline to re-open those proceedings in the absence of any collateral attack by any party against whom the judgments are sought to be enforced.  Thus, Plaintiffs each have a judgment against a terrorist party for a claim for which the terrorist party is not immune under § 1605(a)(7).

In light of this conclusion, the Court need not decide whether Plaintiffs also have a judgment for "a claim based on

an act of terrorism" within the meaning of TRIA.[18]  "Act of

terrorism" is defined by reference to other statutes, and

Plaintiffs suggest that they also have judgments based on an

act of terrorism as defined in those statutes.  However, if a

foreign sovereign was immune from judgment under § 1605(a)(7),

reading "a claim based on an act of terrorism" to include

those foreign sovereigns would defeat that very immunity and

create a whole new category of jurisdiction over otherwise

immune sovereigns.  This Court has before it no indication

that this application reflects Congress's intent in passing

TRIA, an execution statute.  It is possible that such language

was designed to refer to terrorist acts by non-state actors,

and not to state sponsors of terrorism such as Cuba.

Alternatively, the reference to "claims based upon an act of

terrorism" may, as JPM Chase suggests, be meant to authorize

execution where the jurisdictional basis for the judgment to

be enforced is a subsection of 28 U.S.C. § 1605(a) other than

§ 1605(a)(7).  However, in light of this Court's determination

that each Plaintiff here has obtained a judgment against a

terrorist party for a claim for which the terrorist party is

---

[18] TRIA § 201(d)(1) defines "act of terrorism" to mean "(A) any act or event certified under section 102(1) [Pub.L. 107-297, Title I, § 102(1), Nov. 26, 2002, 116 Stat. 2323, which is set out in a note under 15 U.S.C.A. § 6701]; or (B) ... any terrorist activity (as defined in section 212(a)(3)(B)(iii) of the Immigration and Nationality Act (8 U.S.C. 1182(a)(3)(B)(iii)))."

not immune under § 1605(a)(7), the Court does not address the issue any further.

### c.  Blocked Assets

TRIA defines a "blocked asset" as "any asset seized or frozen by the United States under section 5(b) of the Trading With the Enemy Act (50 U.S.C. App. 5(b)) or under sections 202 and 203 of the International Emergency Economic Powers Act (50 U.S.C. 1701; 1702)," excluding diplomatic and consular property and property related to certain transactions licensed by the government.  TRIA § 201(d)(2), codified at 28 U.S.C. § 1610 note.  There is no dispute here that the accounts at issue fall within this definition.  JPM Chase points out that the assets in question are blocked pursuant to the Cuban Assets Control Regulations, 31 C.F.R. Part 515.  These regulations are authorized by § 5(b) of the Trading with the Enemy Act, 50 U.S.C.A. App. 5(b).  See DeCuellar v. Brady, 881 F.2d 1561, 1562-63 (11th Cir. 1989) (explaining source of authority for Cuban Assets control Regulations); American Airways Charters, Inc. v. Regan, 746 F.2d 865, 867 n.1 (D.C. Cir. 1984) (same).

### d.  Compensatory Damages

Here, Weininger was awarded by the Florida Circuit Court $23,939,301.95 (including interest) in compensatory damages. Similarly, that court awarded McCarthy $67,000,000.00

(including interest) in compensatory damages.  Each plaintiff seeks enforcement only as to these compensatory damages. Accordingly, this requirement of TRIA is satisfied.

      e.   <u>Execution Upon the Assets of an Agency or Instrumentality of a Terrorist Party</u>

Plaintiffs seek to execute on accounts that contain assets that the record suggests belong not to the named judgment debtors (the Republic of Cuba, Fidel Castro, Raul Castro, and the Army of the Republic of Cuba), but to other entities, including EMTELCUBA, Banco Nacional, and CUBAEXPORT. Plaintiffs contend that these entities are agencies or instrumentalities of Cuba, and that TRIA therefore allows execution on these assets to satisfy the judgments rendered against Cuba itself.  Plaintiffs' contention raises several issues.  First is whether the entities at issue are agencies or instrumentalities of Cuba.  Second is whether the FSIA imposes any jurisdictional barrier over executing upon the assets of such agencies or instrumentalities to satisfy a judgment that was rendered against another entity.  The third issue, as pointed out by JPM Chase, is whether the Supreme Court's decision in <u>First National City Bank v. Banco Para El Comercio Exterior de Cuba</u>, 462 U.S. 611 (1983) ("<u>Bancec</u>"), nonetheless prohibits execution upon these assets absent a showing by Plaintiffs that these alleged agencies and instrumentalities are not juridically separate from Cuba for

-46-

purposes of both liability and immunity.  As set forth below, this Court finds that the language and legislative history of TRIA demonstrate that Plaintiffs need not overcome the Bancec presumption in order to execute upon the assets of the agencies and instrumentalities of Cuba here.

    (i)  *Placing TRIA in Context in the FSIA*

    As indicated above, the FSIA is the exclusive source of subject matter jurisdiction over all civil actions against foreign states or their agencies and instrumentalities.  See Saudi Arabia, 507 U.S. at 355; Argentine Republic, 488 U.S. at 434; Verlinden, 461 U.S. at 488.[19]  In addition, § 1609 renders the property in the United States of a foreign state, including its agencies and instrumentalities, immune from execution or attachment, including garnishment, unless §§ 1610-11 provide otherwise.  See 28 U.S.C. § 1609;  FG Hemisphere, 455 F.3d at 584; Alejandre, 183 F.3d at 1283; DeLetelier, 748 F.2d at 793.

    Thus, the FSIA preserves a common law distinction between two different aspects of foreign sovereign immunity: jurisdictional immunity from actions brought in United States

---

[19] Verlinden addressed exceptions to immunity of foreign states and their agencies and instrumentalities from suit under §§ 1604, 1605, and 1607, and did not discuss immunity of property from execution or attachment under §§ 1609-1611.  However, the Court in Verlinden stated that the FSIA "contains a comprehensive set of legal standards governing claims of immunity in every civil action against a foreign state or its political subdivisions, agencies or instrumentalities."  461 U.S. at 488 (emphasis added).

courts and immunity from attachment or execution of the
foreign sovereign's property.   See Connecticut Bank of
Commerce v. Republic of Congo, 309 F.3d 240, 252 (5th Cir.
2002) (observing that under FSIA, immunity from execution is
narrower than jurisdictional immunity); 15 James W. Moore,
Moore's Federal Practice § 104.12[1][f] (3d ed. 2005); see
also Brewer, 890 F.2d at 100 ("Foreign states are further
protected from execution of judgments by 28 U.S.C. § 1609 ....
Therefore, even the victorious plaintiff may only pursue
particular property of a foreign state."); DeLetelier, 784
F.2d at 798-99 (observing that in some circumstances under the
FSIA, "a right without a remedy does exist").

Moreover, the FSIA defines a foreign state to include not
only the foreign state itself, but also its political
subdivisions and its agencies and instrumentalities.   See § 28
U.S.C. 1603(a) ("A 'foreign state,' except as used in section
1608 of this title [relating to service of process], includes
a political subdivision of a foreign state or an agency or
instrumentality of a foreign state as defined in [§
1603(b)].").   Therefore, such agencies and instrumentalities
also enjoy immunity from suit and execution unless an
exception applies.   See Alejandre, 183 F.3d at 1283;
DeLetelier, 748 F.2d at 793.   Plaintiffs contend that the
entities whose assets are at issue are agencies and

-48-

instrumentalities of Cuba -- indeed, they insist on this, in order to bring the assets of these entities within the scope of TRIA.  Assuming for the moment that such entities are indeed agencies and instrumentalities of Cuba as defined in § 1603(b), their assets would be immune from execution absent an exception to immunity as found in §§ 1610-11.  See S & S Machinery Co. v. Masinexportimport, 706 F.2d 411, 415-16 (2d Cir. 1983) ("Having held that the district court correctly concluded that the Romanian Bank and Masin are agencies or instrumentalities of the Romanian state, it follows that they are entitled to protection as 'foreign state[s]' within the meaning of § 1603(a) of the Act.  Among the protections accorded to foreign states by the Act is the immunity from attachment provided in § 1609.").

Sections 1610(a) and 1610(b) provide a list of several exceptions to the immunity from attachment and execution provided by § 1609.  For example, § 1610(a)(1) allows for execution on property used for commercial activity where the foreign state has expressly or impliedly waived its immunity from attachment.  See 28 U.S.C. § 1610(a)(1).  Similarly, § 1610(a)(7) allows for execution on property used for commercial activity where "the judgment relates to a claim for which the foreign state is not immune under section 1605(a)(7), regardless of whether the property is or was

involved with the act upon which the claim is based." 28
U.S.C. § 1610(a)(7).   Section 1610(b) provides several
additional exceptions to immunity allowing for execution of an
agency or instrumentality's property where the agency or
instrumentality is engaged in commercial activity in the
United States.   See 28 U.S.C. § 1610(b); see also Ministry of
Defense & Support for the Armed Forces of the Islamic Republic
of Iran v. Elahi, 546 U.S. __, 126 S.Ct. 1193 (2006);
Connecticut Bank of Commerce, 309 F.3d at 252-53; DeLetelier,
784 F.2d at 798-99.   Section 1611, which the Court addresses
below, places certain restrictions on the execution of
property of a foreign central bank.

      While at first glance § 1610(a)(7) may appear to apply to
the situation at hand, Plaintiffs do not seek to execute under
this statutory subsection, presumably because there is
insufficient evidence that the property at issue here is
property used for commercial activity; instead, it consists of
blocked assets.   Nor have Plaintiffs sought to execute under
§ 1610(b), presumably because the alleged agencies and
instrumentalities here are not engaged in commercial activity
in the United States.   Instead, Plaintiffs seek an exception
to immunity from attachment through TRIA.   Such an approach is
not without precedent.   See, e.g., Rubin v. Islamic Republic
of Iran, No. 06 Civ. 11053, 2006 WL 2879759, at *4 (D. Mass.

Sept. 30, 2006) ("The property's immunity under FSIA [§ 1610(a)(7)] notwithstanding, the plaintiffs may still be able to obtain the antiquities pursuant to § 201 of the Terrorism Risk Insurance Act of 2002.").

The legislative history of § 201 of TRIA provides persuasive guidance in the resolution of the issue before the Court. TRIA § 201 was passed in order to "deal comprehensively with the problem of enforcement of judgments rendered on behalf of victims of terrorism in any court of competent jurisdiction by enabling them to satisfy such judgments through the attachment of blocked assets of terrorist parties. It is the intent of the Conferees that Section 201 establish that such judgments are to be enforced." H.R. Conf. Rep. 107-779, at 27 (2002), reprinted in 2002 U.S.C.C.A.N. 1430, at 1434-35; see Hill v. Republic of Iraq, No. 99 Civ. 03346, 2003 WL 21057173, at *2 (D.D.C. Mar. 11, 2003) (discussing enactment of TRIA). As noted by the Second Circuit, the plain meaning of the phrase that blocked assets "shall be subject to execution or attachment in aid of execution" "is to give terrorist victims who actually receive favorable judgments a right to execute against assets that would otherwise be blocked." Smith ex rel. Estate of Smith v. Fed. Reserve Bank of New York, 346 F.3d 264, 271 (2d Cir. 2003).

On its face, TRIA would appear to provide the exception to immunity from attachment that Plaintiffs seek. _Bancec_, however, complicates this analysis.

### (ii) _The Effect of TRIA upon Bancec_

In _Bancec_, the Supreme Court held that government instrumentalities established as juridical entities distinct and independent from their sovereign should normally be treated as such, so that an agency or instrumentality of a foreign state could not automatically be liable for the debts of its associated foreign state. _See_ 462 U.S. at 626-27.[20] The rationale for this principle is that

> [t]he language and history of the FSIA clearly establish that the Act was not intended to affect the substantive law determining the liability of a foreign state or instrumentality, or the attribution of liability among instrumentalities of a foreign state.

_Id._ at 620. Instead, FSIA expressly provided that liability of a foreign state is determined "'in the same manner and to the same extent as a private individual under like circumstances.'" _Id._ (_quoting_ 28 U.S.C. § 1606).[21] Thus, the

---

[20] In that case, Bancec, a credit institution wholly owned by Cuba had sued Citibank to recover on a letter of credit. Citibank counterclaimed and sought a setoff from Bancec for the value of Citibank's branches that had been seized by the Cuban government. _See Bancec_, 462 U.S. at 615. _Bancec_ contended that its separate juridical status shielded it from liability for acts of the Cuban government. _Id._ at 617.

[21] The FSIA's legislative history also revealed that it was "'not intended to affect the substantive law of liability [or] ... the attribution of responsibility between or among entities of a foreign state.'" _Id._ (_quoting_ H.R. Rep. No. 94-1487, at 12 (1976), _reprinted_ _in_ 1976 U.S.C.C.A.N. 6604, at 6610).

Court looked to substantive law to determine whether Bancec could be liable for the acts of its government.  Examining international and federal common law,[22] it concluded that "government instrumentalities established as juridical entities distinct and independent from their sovereign should normally be treated as such."  Id. at 626-27.

However, although there existed a "presumption that a foreign government's determination that its instrumentality is to be accorded separate legal status," id. at 628, such presumption could be overcome in certain circumstances.  Id. First, where a corporate entity "is so extensively controlled by its owner that a relationship of principal and agent is created," one could be held liable for the actions of the other.  Id. at 629.  Second, the doctrine of corporate entity would not be regarded "'when to do so would work fraud or injustice.'"  Id. (quoting Taylor v. Standard Gas Co., 306 U.S.

_____

Perhaps even more relevant to this case, Bancec also quoted a section of the FSIA's legislative history on attachment and execution under § 1610(a)(2); the legislative history indicated that in determining whether property in the United States of a foreign state is immune from attachment and execution under that part of the statute, courts "will have to determine whether property 'in the custody of' an agency or instrumentality is property 'of' the agency or instrumentality, whether property held by one agency should be deemed to be property of another, [and] whether property held by an agency is property of the foreign state."  Id. at 621 n.8 (quoting H.R. Rep. No. 94-1487 at 28, U.S.C.C.A.N. 1976, at 6627).

[22] Because Bancec's claim arose under international law, which "is part of our law," the court applied international law and federal common law as informed by both international law principles and congressional policies. Id. at 622-23.

307, 322 (1939)).[23]

Under <u>Bancec</u>, before Plaintiffs here could recover on their judgments against Cuba by executing upon the assets of Cuba's agencies or instrumentalities, they would need to overcome the presumption that the alleged agencies and instrumentalities here should be treated as entities juridically separate from Cuba. Post-<u>Bancec</u>, several circuits, including the Second Circuit, have followed this analysis. <u>See</u>, <u>e.g.</u>, <u>Flatow v. Islamic Republic of Iran</u>, 308 F.3d 1065, 1069-73, 1073 (9th Cir. 2002) (finding that plaintiff could not overcome presumption that Iranian bank was juridically separate from Iran, and thus could not execute on assets of Iranian bank to satisfy judgment against Iran); <u>Alejandre</u>, 183 F.2d at 1284-89 (finding that plaintiffs did not overcome presumption that ETECSA, a Cuban telecommunications company, was juridically separate from Cuba, and thus could not execute on ETECSA's assets to satisfy judgment against Cuba); <u>Walter Fuller Aircraft Sales, Inc. v. Republic of Philippines</u>, 965 F.2d 1375, 1381 (5th Cir. 1992)

---

[23] Applying these principles, the Supreme Court concluded that Bancec could be held liable, because Bancec's claim against which Citibank sought a setoff had devolved into the hands of the Cuban government, the Cuban government would be the only beneficiary of any recovery, and Bancec itself had filed a claim against Citibank.  Under such circumstances, giving effect to Bancec's separate juridical status "would permit the real beneficiary of such an action, [] Cuba, to obtain relief in our courts that it could not obtain in its own right without waiving its sovereign immunity and answering for the seizure of Citibank's assets." <u>Id.</u> at 631-32.

("Section 1603 defines the universe of entities entitled to statutory sovereign immunity.  This is completely different from the question whether a foreign state and its agency or instrumentality are alter egos for purposes of substantive liability."); DeLetelier, 748 F.2d at 794-95 (finding that plaintiffs could not execute against assets of Chile's wholly-owned airline to satisfy judgment against Chile, because plaintiffs did not overcome presumption that airline was juridically separate from Chile); see also Bayer & Willis Inc. v. Republic of Gambia, 283 F. Supp. 2d 1, 4 (D.D.C. 2003) ("[A]n entity's status as an agency or instrumentality of a foreign sovereign is insufficient, without more, to establish that the entity is liable for the debts of the foreign state."); Pravin Banker Assocs., Ltd. v. Banco Popular del Peru, 9 F. Supp. 2d 300, 307 (S.D.N.Y. 1998) (holding that plaintiff could not attach property of Peruvian-owned corporation, an instrumentality of Peru, to collect on a debt owed by Peru when plaintiff did not overcome presumption that the corporation was separate juridical entity).

Plaintiffs contend that TRIA obviates this Bancec analysis.  By Plaintiffs' account, TRIA's plain language eliminates any impediment to execution against the blocked assets of a terrorist party's agency or instrumentality to satisfy a judgment rendered against the terrorist party.

-55-

Plaintiffs also contend that this interpretation is supported by TRIA's legislative history.

The Court agrees with Plaintiffs that TRIA works to obviate analysis of the <u>Bancec</u> presumption. TRIA clearly provides that "in every case in which a person has obtained a judgment against a <u>terrorist party</u> on a claim ... for which a <u>terrorist party</u> is not immune under 28 U.S.C. § 1605(a)(7), the blocked assets of that terrorist party (<u>including the blocked assets of any agency or instrumentality of that terrorist party</u>) shall be subject to execution or attachment in aid of execution...." TRIA § 201(a) (emphasis added). The first part of this passage refers to judgments against a "terrorist party" -- not against an agency or instrumentality of the terrorist party. Yet the second part of this passage refers not only to the blocked assets of the terrorist party, but specifically includes the blocked assets of any "agency or instrumentality" of that terrorist party. TRIA thus explicitly provides that where a judgment against a terrorist party exists, not only its blocked assets, but the assets of its agencies and instrumentalities can be used to satisfy the judgment. The language of TRIA itself thus indicates that Congress intended to make the agencies or instrumentalities of statutorily defined terrorist parties liable for qualifying judgments rendered against the terrorist party in question.

See Estates of Ungar & Ungar ex rel. Strachman v. Palestinian Authority, 304 F. Supp. 2d 232, 241 (D.R.I. 2004) (finding that because the Holy Land Foundation ("HLF") was an agency or instrumentality of Hamas, "HLF's blocked assets are also subject to attachment and execution under the TRIA in order to satisfy the present judgment against Hamas") (emphasis added).[24]

The legislative history of TRIA also supports this interpretation. On the Senate floor, addressing the Senate in connection with the conference report accompanying TRIA, Senator Harkin, a sponsor of TRIA, stated:

> I rise to address a portion of this conference agreement relating to enforcement of judgments obtained by victims of terrorism against state sponsors of terrorism. ...
>
> Title II expressly addresses three particular issues which have vexed victims of terrorism in this context. First, there has been a dispute over the availability of "agency and instrumentality" assets to satisfy judgments against a terrorist state itself. Let there be no doubt on this point. Title II operates to strip a terrorist state of its immunity from execution or attachment in aid of execution by making the blocked assets of that terrorist state, including the blocked assets of any of

---

[24] The Court also takes note of another case pointed to by Plaintiffs, Rubin v. Islamic Republic of Iran, No. 01 Civ. 1655, 2005 WL 670770 (D.D.C. March 23, 2005). In that case, plaintiffs had obtained a judgment against Iran, the Iranian Ministry of Information and Security, and certain senior Iranian officials. See id. at *1 n.2. To satisfy the judgment, the court authorized execution under TRIA upon accounts owned by the Iranian consulate. See id. at *3, *5. The court therefore appeared to follow a reading of TRIA that authorizes the use of an agency or instrumentality's assets to satisfy a judgment against a terrorist party without engaging in any Bancec analysis. This Court notes, however, that the Rubin court did not expressly examine the issue, and that it also referred to the consular assets as "belonging to the defendants." Id. at *1. Thus, the case is not definitive on the issue.

> its agencies or instrumentalities, available for
> attachment and/or execution of a judgment issued against
> that terrorist state. <u>Thus</u>, <u>for purposes of enforcing a
> judgment against a terrorist state</u>, title II does not
> recognize any juridical distinction between a terrorist
> state and its agencies or instrumentalities.

148 Cong. Rec. S11524, at S11528 (Nov. 19, 2002) (statement of
Sen. Harkin) (emphasis added).  Where statements by a sponsor
on the floor are consistent with the statutory language and
other legislative history, congressional intent may be
inferred.  <u>See</u> <u>Brock v. Pierce County</u>, 476 U.S. 253, 263
(1986) (sponsor's statements not controlling but provide
evidence of congressional intent when "consistent with the
statutory language and other legislative history"); <u>Bowsher v.
Merck & Co.</u>, 460 U.S. 824, 832-33 (1983) (sponsor's statement,
which had been the only explanation in the legislative history
as to an amendment's meaning and purpose, was "authoritative
guide" to statute's construction).  Here, Senator Harkin's
statements are clear and consistent with the interpretation
suggested by TRIA's statutory language, and no contrary
legislative history has been called to this Court's attention.

The Court notes that the Eleventh Circuit has rejected
the argument that § 1610(f)(1)(A), a provision of the FSIA
worded similarly to TRIA § 201(a), legislatively overruled
<u>Bancec</u>'s presumption of separate juridical status for
liability purposes. However, while similar, TRIA § 201(a) is
worded differently from § 1610(f)(1)(A) and, as indicated, is

-58-

supported by legislative history suggesting an intent to override the <u>Bancec</u> presumption of independent status for the agencies and instrumentalities of terrorist parties.  Section 1610(f)(1)(A) was a previous attempt by Congress to make blocked assets available to satisfy judgments against terrorist parties.[25]  It provides:

> Notwithstanding any other provision of law, ... <u>any property</u> with respect to which financial transactions are prohibited or regulated pursuant to [certain statutes that authorize the blocking of assets] ... [or any] license issued pursuant thereto, <u>shall be subject to execution</u> or attachment in aid of execution <u>of any judgment relating to a claim for which a foreign state (including any agency or instrumentality of such state) claiming such property is not immune under section 1605(a)(7)</u>.

28 U.S.C. § 1610(f)(1)(A) (emphasis added).  <u>Alejandre</u> held that this provision did not override the <u>Bancec</u> presumption of separate juridical status for liability purposes.  <u>See</u> 183 F.3d at 1287.  Instead, the effect of § 1610(f)(1)(A) was merely to allow plaintiffs to execute upon property claimed by the foreign government without first obtaining a license from the CACR.  <u>Id.</u>  However, in reaching this conclusion, the Circuit Court noted,

> Congress has previously demonstrated in the FSIA context that it knows how to express clearly an intent to make instrumentalities substantively liable for the debts of

---

[25] That provision was waived by the President the same day it was signed into law, although the scope of the waiver is in dispute. <u>See</u> <u>generally</u> David M. Ackerman, Congressional Research Service, <u>Suits Against Terrorist States</u> (Jan. 25, 2002), <u>available at</u> http://fpc.state.gov/documents/organization/8045.pdf.

their related foreign governments.  <u>Absent</u> <u>such</u> <u>a</u> <u>clear</u>
<u>expression</u>, which does not appear in section
1610(f)(1)(A), we see no reason to interpret that section
as contravening Congress' original understanding that the
FSIA "[is] not intended to affect the substantive law
determining the liability of a foreign state or
instrumentality, or the attribution of liability among
instrumentalities of a foreign state."

<u>Id.</u> at 1287-88 (emphasis added) (<u>quoting</u> <u>Bancec</u>, 462 U.S. at

620).  <u>See</u> <u>also</u> <u>Flatow v. Islamic Republic of Iran</u>, 308 F.3d

at 1071 n.10 (agreeing with <u>Alejandre</u> analysis).

In contrast, in the plain language of TRIA and its

legislative history there <u>is</u> such a clear expression to make

the instrumentalities substantively liable for the debts of

their related foreign governments, in certain circumstances.

TRIA § 201(a) specifically provides that "in every case in

which a person has obtained a judgment against a <u>terrorist</u>

<u>party</u> on a claim ... for which a <u>terrorist</u> <u>party</u> is not immune

under 28 U.S.C. § 1605(a)(7), the blocked assets of that

terrorist party (<u>including</u> <u>the</u> <u>blocked</u> <u>assets</u> <u>of</u> <u>any</u> <u>agency</u> <u>or</u>

<u>instrumentality</u> <u>of</u> <u>that</u> <u>terrorist</u> <u>party</u>) shall be subject to

execution or attachment in aid of execution...."  TRIA §

201(a) (emphasis added).  TRIA thus expressly provides that

where a judgment against a terrorist party exists, not only

its assets, but the assets of its agencies and

instrumentalities can be used to satisfy the judgment.  In

contrast, § 1610(f)(1)(A) states that if a creditor seeks to

execute on assets claimed by an agency or instrumentality of

-60-

a foreign state, that agency or instrumentality must already
not be "immune under § 1605(a)(7)."   28 U.S.C. §
1610(f)(1)(A).

_____Further support for this interpretation is gleaned from
a comparison provided by the court in Alejandre.   There, the
court noted that in 1988, a bill was introduced in the House
of Representatives that would have amended § 1610(a) to
deprive a foreign state's U.S. property of immunity from
execution if "the property belongs to an agency or
instrumentality of a foreign state engaged in a commercial
activity in the United States and the judgment relates to a
claim for which the foreign state is not immune from
jurisdiction by virtue of section 1605 or 1607."   See
Alejandre, 183 F.3d at 1287 n.25 (quoting H.R. Res. 3763,
100th Cong. § 3(1)(D) (1988), 134 Cong. Rec. H6484-01)
(emphasis added).   TRIA's language is similar and operates to
make the agency or instrumentality of a terrorist party liable
for judgments against the terrorist party itself.   Finally, a
clear expression of such congressional intent consistent with
this reading is found in the statement of Senator Harkin on
the Senate floor, as quoted above.

Thus, this Court finds that TRIA allows for execution of
the blocked assets of "juridically separate" entities to
satisfy a judgment against a designated terrorist party, as

-61-

defined by TRIA, when such entities are agencies or instrumentalities of that terrorist party.

However, given the common law distinction, preserved in the FSIA, between immunity from jurisdiction and immunity from execution, the question still remains of whether, even if the agency or instrumentality can be substantively liable for the debts of its related foreign state, whether and which of its assets are nonetheless immune from execution. Some courts have applied Bancec's separate juridical status presumption not only for liability determinations, but for exceptions to immunity. See Alejandre, 183 F.3d at 1284, 1287 n.23 ("[T]he Bancec presumption of separate juridical status applies for purposes of determining both whether an instrumentality can be held responsible for the debts of its related foreign government and whether the instrumentality retains its immunity from execution."); Foremost-McKesson, Inc. v. Islamic Republic of Iran, 905 F.2d 438, 446 (D.C. Cir. 1990) ("The presumption of the juridical separateness of entities also applies to jurisdictional issues."); see also Zappia, 215 F.3d at 251-52 (holding that plaintiff did not demonstrate sufficient intermingling of private banks with foreign sovereign to overcome Bancec's presumption of juridical separateness, and therefore immunity exception that might have applied to foreign sovereign did not apply to its

instrumentalities); <u>Hercaire Int'l, Inc. v. Argentina</u>, 821 F.2d 559, 564-65 (11th Cir. 1987) (because Argentina's 100 percent ownership of airline's stock was not sufficient to overcome the presumption of separate juridical existence, Argentina's express waiver of immunity from execution for itself "and its agencies" did not operate to waive airline's immunity and thus airline's property was immune from attachment of its assets to satisfy judgment against Argentina).

This Court concludes that the "notwithstanding any other provision of law" language in TRIA operates as an exception to immunity from both jurisdiction and execution.  In <u>Alejandre</u> the Eleventh Circuit observed that the "notwithstanding any other provision of law" provision of § 1610(f)(1)(A) <u>could</u> persuasively be read to be an exception to immunity, as well as functioning to remove a CACR license requirement for garnishing assets, but did not decide the issue.  <u>See</u> <u>Alejandre</u>, 183 F.3d at 1287 n.23.[26]  Here, the Court finds that it makes sense to interpret § 201(a) of TRIA to indeed provide such an exception to immunity.  First, TRIA is codified as a

---

[26] The Circuit Court did not decide the issue because, by its analysis, there were two inquiries: whether the instrumentality could be liable for the debts of its related foreign government, and whether the instrumentality retained its immunity from execution.  <u>Id.</u>  Because it found that plaintiffs had not overcome the presumption that the instrumentality was juridically separate and therefore not liable for the debts of its related foreign government, the Court did not address whether, even if the instrumentality was liable, its assets were nonetheless immune from execution.  <u>Id.</u>

note to § 1610, which is one of the statutory sections
providing exceptions to immunity.  Second, although §§ 1610(a)
and (b) list specific exceptions to executional immunity, and
thus an additional exception to immunity would have been added
to such list rather than codified elsewhere, this
interpretation of this language makes sense, as it would be
contradictory for Congress in the same breath to expressly
make assets subject to execution and at the same time make the
owner of those assets immune from suit to recover those
assets.  Third, the legislative history quoted above refers to
immunity and for terrorist states conflates the immunity of
the terrorist state and its agencies and instrumentalities.
See 148 Cong. Rec. S11524, at S11528 (Nov. 19, 2002)
(statement of Sen. Harkin) ("Title II operates to strip a
terrorist state of its immunity from execution or attachment
in aid of execution by making the blocked assets of that
terrorist state, including the blocked assets of any of its
agencies or instrumentalities, available for attachment and/or
execution of a judgment issued against that terrorist
state.").

Consistent with this Court's interpretation, other courts
examining the scope of TRIA § 201(a) have concluded that the
"notwithstanding any other provision of law" language
specifically addresses immunity.  See United States v. Holy

<u>Land Found. For Relief & Dev.</u>, 445 F.3d 771, 787 (5th Cir. 2006) ("We conclude that the 'notwithstanding' language ... appears to target statutory immunities to execution."); <u>Smith ex rel. Estate of Smith v. Fed. Reserve Bank of New York</u>, 280 F. Supp. 2d 314, 319 (S.D.N.Y. 2003) ("[T]o the extent that a foreign country's sovereign immunity potentially conflicts with Section 201(a), the 'notwithstanding' phrase removes the potential conflict."), <u>aff'd</u>, 346 F.3d 264 (2d Cir. 2003); <u>Hill</u>, 2003 WL 21057173, at *2 ("[B]y its plain terms, the TRIA overrides any immunity from execution that blocked Iraqi property might otherwise enjoy under the Vienna Convention or the FSIA.").[27]

3.  <u>Subject Matter Jurisdiction through Ancillary Jurisdiction</u>

As set forth above, because TRIA § 201(a) provides an exception to immunity from execution, this Court has subject matter jurisdiction over this action. Alternatively, at least with respect to the judgment debtors, this Court has subject

---

[27] The issue in these cases was the scope of the "notwithstanding any other provision of law" language.  The courts determined that the language addressed exceptions to immunity and therefore did not override other statutes that did not conflict with immunity provisions.  <u>See</u>, <u>e.g.</u>, <u>Holy Land Found.</u>, 445 F.3d at 787 (holding that because TRIA's "notwithstanding" language addresses statutory immunities to execution, it does not preempt, trump, or otherwise interfere with operation of criminal forfeiture statutes, which do not involve immunity of assets from execution); <u>Smith</u>, 280 F. Supp. 2d at 319 (although the "notwithstanding" language removes conflicts related to sovereign immunity, it does "not mean ... that the TRIA covers the entire field and nullifies all previous statutes that pertain to blocked assets"), <u>aff'd</u>, 346 F.3d at 271 (2d Cir. 2003) (holding that the "notwithstanding" clause applies "only when some 'other provision of law' conflicts with TRIA").

matter jurisdiction through ancillary jurisdiction to enforce a judgment.

The Second Circuit has held that a foreign instrumentality's waiver of sovereign immunity "continues through post-judgment discovery and collection of the money judgment," and thus "where subject matter jurisdiction under the FSIA exists to decide a case, jurisdiction continues long enough to allow proceedings in aid of any money judgment that is rendered in the case." First City, Texas-Houston, N.A. v. Rafidain Bank, 281 F.3d 48, 52, 53-54 (2d Cir. 2002), cert. denied, 537 U.S. 813 (2002). Recently, another federal district court, in a proceeding to enforce a judgment by attaching property purportedly belonging to Iran, a foreign sovereign, chose this approach to finding subject matter jurisdiction over the enforcement proceeding. Faced with arguments by the trustees holding the property similar to those raised by the garnishee and amicus here, the court noted that "[t]o the extent that the trustee process defendants rely on Verlinden to argue that § 1609 is best construed as raising a threshold question of subject matter jurisdiction, it is largely irrelevant here, where the Court plainly has jurisdiction pursuant to 28 U.S.C. § 1963." Rubin v. Islamic Republic of Iran, No. 06 Civ. 11053, 2006 WL 2879759, at *2 n.3 (D. Mass. Sept. 30, 2006) (further noting that "the

-66-

Supreme Court's discussion of subject matter jurisdiction in
Verlinden was centered on 28 U.S.C. §§ 1330 and 1604; neither
§ 1609 nor execution immunity more generally were
addressed.").

Following this analysis, the Court here has subject
matter jurisdiction over both the Weininger and McCarthy
enforcement actions through ancillary jurisdiction to enforce
the judgment, at least as to Cuba.  With regard to the
Weininger judgment, on December 13, 2005, this Court entered
an order and judgment in favor of Weininger.  Accordingly,
this Court has subject matter jurisdiction over this
enforcement proceeding through ancillary jurisdiction to
enforce a judgment.  With regard to the McCarthy judgment,
McCarthy obtained a federal judgment in the United States
District Court for the Southern District of Florida, in an
action on the state judgment, and on May 25, 2005 registered
her federal judgment with this Court pursuant to 28 U.S.C. §
1963.  Upon registration of the judgment, this Court obtained
subject matter jurisdiction over the enforcement proceeding
through ancillary jurisdiction to enforce a judgment.  See
Rubin v. Islamic Republic of Iran, No. 06 Civ. 11053, 2006 WL
2879759, at *1 (D. Mass. Sept. 30, 2006) ("This Court acquired
jurisdiction over the present controversy [to attach assets
purportedly belonging to Iran] when the plaintiffs registered

here the judgment they had obtained against Iran in the United States District Court for the District of Columbia."); see also RCA Corp. Tucker, 696 F. Supp. 845, 850 (E.D.N.Y. 1988) ("[A]s to subject matter jurisdiction, the authorities are unanimous that a federal court maintains ancillary jurisdiction to enforce its own judgments, and that, under Rule 69, Fed. R. Civ. P., no independent jurisdictional basis is necessary to commence an enforcement proceeding against a garnishee not a party to the original suit.").

Of course, this proceeding involves attempts to execute on the assets of entities not named in the original judgment. Rubin did not involve an attempt to enforce a judgment against a foreign state by attaching the assets of an agency or instrumentality.  The Court recognizes that the Supreme Court has stated that "[w]e have never authorized the exercise of ancillary jurisdiction in a subsequent lawsuit to impose an obligation to pay an existing federal judgment on a person not already liable for that judgment."   Peacock v. Thomas, 516 U.S. 349, 357 (1996).  As aptly stated by the First Circuit:

> Where a postjudgment proceeding presents an attempt simply to collect a judgment duly rendered by a federal court, even if chasing after the assets of the judgment debtor now in the hands of a third party, the residual jurisdiction stemming from the court's authority to render that judgment is sufficient to provide for federal jurisdiction over the postjudgment claim. However, where that postjudgment proceeding presents a new substantive theory to establish liability directly on the part of a new party, some independent ground is necessary to assume

federal jurisdiction over the claim, since such a claim is no longer a mere continuation of the original action.

U.S.I. Props., 230 F.3d at 498 (citations omitted).  Here, however, TRIA expressly holds such entities liable for the judgment and renders them not immune from execution, and thus provides the independent basis of subject matter jurisdiction in this enforcement proceeding against these entities.

4.   Personal Jurisdiction

        The Court also finds no defect of personal jurisdiction here.  Preliminarily, the Court observes that the entities against which the judgments are sought to be enforced have not challenged personal jurisdiction.  However, these entities have not waived personal jurisdiction but instead have defaulted entirely.  Several circuits have held that because relief from a void judgment is mandatory, "when entry of a default judgment is sought against a party who has failed to plead or otherwise defend, the district court has an affirmative duty to look into its jurisdiction both over the subject matter and the parties. In reviewing its personal jurisdiction, the court does not assert a personal defense of the parties; rather, the court exercises its responsibility to determine that it has the power to enter the default judgment." Williams v. Life Sav. & Loan, 802 F.2d 1200, 1203 (10th Cir. 1986); see also System Pipe & Supply, Inc. v. M/V Viktor Kurnatovskiy, 242 F.3d 322, 324 (5th Cir. 2001)

(because a judgment entered without jurisdiction is void, "a district court has the duty to assure itself that it has the power to enter a valid default judgment"); In re Tuli, 172 F.3d 707, 712 (9th Cir. 1999) ("When entry of judgment is sought against a party who has failed to plead or otherwise defend, a district court has an affirmative duty to look into its jurisdiction over both the subject matter and the parties. ... To avoid entering a default judgment that can later be successfully attacked as void, a court should determine whether it has the power, i.e., the jurisdiction, to enter the judgment in the first place."); Estates of Ungar & Ungar ex rel. Strachman v. Palestinian Authority, 325 F. Supp. 2d 15, 45 (D.R.I. 2004) ("A court which is asked to enter default judgment should assure itself that it has jurisdiction both over the subject matter and the parties.").

In light of these concerns, and the FSIA's requirement that "[n]o judgment by default shall be entered by a court of the United States ... against a foreign state, a political subdivision thereof, or an agency or instrumentality of a foreign state, unless the claimant establishes his claim or right to relief by evidence satisfactory to the court," 28 U.S.C. § 1608(e), this Court will respond to the parties'

arguments concerning personal jurisdiction.[28]

JPM Chase asserts that "this Court must determine that it has personal jurisdiction over parties whose assets are sought to be attached, i.e., that those parties have been properly served in accordance with 28 U.S.C. § 1608."  (Mem. of Law in Response to Motion for Partial Summary Judgment on Claims for Turnover and in Support of Cross-Motion for Relief in the Nature of Interpleader, dated Mar. 10, 2006, at 19.)  Under the FSIA, personal jurisdiction over an action against a foreign state (or its agencies or instrumentalities) is achieved by the existence of subject matter jurisdiction under § 1330(a) plus service of process in accordance with § 1608.  See 28 U.S.C. § 1330(b) ("Personal jurisdiction over a foreign state shall exist as to every claim for relief over which the district courts have jurisdiction under subsection (a) where service has been made under section 1608 of this title.");  Verlinden, 461 U.S. at 485 n.5; Shapiro, 930 F.2d at 1020 ("Under the FSIA, therefore, personal jurisdiction equals subject matter jurisdiction plus valid service of process.").

In response, Plaintiffs contend that the FSIA does not

---

[28] This "satisfactory to the court" standard is identical to the standard under Federal Rule of Civil Procedure 55(e) for entry of default judgments against the United States, and is intended to provide foreign governments with the same protections from default judgments that the federal government enjoys.  See Commercial Bank of Kuwait v. Rafidain Bank, 15 F.3d 238, 242 (2d Cir. 1994); Campuzano v. Islamic Republic of Iran, 281 F. Supp. 2d 258, 268 (D.D.C. 2003); Smith ex rel. Estate of Smith v. Islamic Emirate of Afghanistan, 262 F. Supp. 2d 217, 221 (S.D.N.Y. 2003).

apply to any determination of personal jurisdiction in this matter, because "the FSIA jurisdictional provisions only address cases in which the foreign sovereign is a party. In this garnishment and execution proceeding (where the actions have been filed against Chase and the Rabinowitz Firm as garnishees), however, personal jurisdiction over the judgment debtor/foreign sovereign is not required." (Pls. Reply Mem. at 12.) Plaintiffs further contend that "under New York law and procedure only the garnishees (i.e. Chase and the Rabinowitz Firm) were required to be served with the turnover pleadings, and the Cuba entities only had to be provided with notice of the proceeding." (Id. at 29 n.23.)

In support of their arguments, Plaintiffs rely solely on RCA Corp. v. Tucker, which noted that under the New York CPLR, in turnover proceedings against a garnishee, the judgment debtor is not a necessary party but must merely be given notice. See 696 F. Supp. at 850. RCA Corp., however, did not involve a foreign sovereign and did not involve the FSIA. Rule 69 authorizes the use of state law enforcement procedures to the extent that they do not conflict with federal law. See Fed. R. Civ. P. 69 ("The procedure on execution, in proceedings supplementary to and in aid of a judgment ... shall be in accordance with the practice and procedure of the state in which the district court is held ... except that any

statute of the United States governs to the extent that it is applicable."). In light of Congress's intent to have the FSIA establish "a comprehensive set of legal standards governing claims of immunity in every civil action against a foreign state or its political subdivisions, agencies, or instrumentalities," Verlinden, 461 U.S. at 488, the Court is not persuaded that the FSIA plays no role in determining personal jurisdiction in this case. Cf. Karaha Bodas Co. v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara, 313 F.3d 70, 85 (2d Cir. 2002) (noting that in FSIA cases, federal courts use state choice of law rules to resolve all issues except jurisdictional ones, which require application of federal law).

On the other hand, Plaintiffs' position is not wholly without merit. Section 1330(b)'s provisions for personal jurisdiction turn on § 1330(a)'s provisions for subject matter jurisdiction, which in turn are grounded on the statutory exceptions to immunity from jurisdiction found in §§ 1605-1607, not the statutory exceptions to immunity from execution and attachment found in §§ 1610-1611. See § 1330(a) ("The district courts shall have original jurisdiction without regard to amount in controversy of any nonjury civil action against a foreign state as defined in section 1603(a) of this title as to any claim for relief in personam with respect to

which the foreign state is not entitled to immunity either under sections 1605-1607 of this title or under any applicable international agreement."). The matter before the Court is an enforcement action -- in particular, one seeking garnishment, which is a quasi in rem proceeding rather than a traditional in personam proceeding. See FG Hemisphere, 455 F.3d at 585 ("In contrast to a suit against the debtor, a garnishment proceeding is operative in personam against the garnishee to prevent him from paying the debt to the garnishment debtor and is operative in rem upon the property of the defendant debtor in the hands of the garnishee. Thus, garnishment is a quasi in rem action in which 'the plaintiff seeks to apply what he concedes to be the property of the defendant to the satisfaction of a claim against him.'") (quoting Shaffer v. Heitner, 433 U.S. 186, 199 n.17 (1977)) (other citations and quotations omitted).

Nonetheless, the personal jurisdiction concern may be academic, because in the case at hand the alleged agencies and instrumentalities in question have been served by JPM Chase in accordance with the FSIA. JPM Chase has submitted evidence demonstrating that it effected FSIA service pursuant to § 1608(b)(3)(B) upon the agencies and instrumentalities affected by these proceedings, and service as well upon the judgment debtors. Indeed, JPM Chase relies on such service to

establish its own right to proper interpleader relief.  JPM Chase served all the entities in question in this consolidated proceeding with a summons, notice of petition, and petition, in English and Spanish, that clearly indicate the nature of the relief sought and the accounts and assets upon which Plaintiffs seek to execute, as well as with its motion papers seeking interpleader relief.

Section § 1608(b)(3)(B) provides that if service cannot be made pursuant to § 1608(b)(1) (by special arrangement between the plaintiff and agency or instrumentality), or § 1608(b)(2) (by delivery to an agent authorized to receive process in the United States or in accordance with international conventions on service of judicial documents), then service can be made upon an agency or instrumentality of a foreign state by delivering a copy of the summons and complaint, together with a translation of each into the official language of the foreign state, "by any form of mail requiring a signed receipt, to be addressed and dispatched by the clerk of the court to the agency or instrumentality to be served," provided that such service is "reasonably calculated to give actual notice."  28 U.S.C. § 1608(b)(3)(B).  JPM Chase has submitted to this Court documentation indicating that it has satisfied these requirements.

As to service on Cuba, Weininger has submitted an

affidavit representing that service upon Fidel Castro, Raul Castro, the Army of the Republic of Cuba, and the Republic of Cuba has been made by DHL, although the service does not purport to comply with the FSIA but instead only with CPLR § 5225(b) (See Perkins Decl. ¶ 12.)  McCarthy, however, has submitted documentation indicating that she has made service of her turnover petition in accordance with the FSIA upon the Republic of Cuba, as well as the various Cuban entities identified by Chase in its papers (including Banco Nacional, EMTELCUBA, RADIOCUBA, ETECSA, and CUBAEXPORT) with her petition and notice of petition in both English and Spanish, pursuant to FSIA § 1608(a)(3). (See R.56.1 Statement ¶ 40; DeMaria Aff. ¶ 9; Docket No. 104.)  Moreover, JPM Chase has effected service on Cuba pursuant to the FSIA.

Therefore, to the extent that the Court msut find personal jurisdiction over these entities pursuant to the FSIA by service pursuant to § 1608, the Court is satisfied that such personal jurisdiction exists.[29]

---

[29] Under the law of this Circuit, the assertion of personal jurisdiction may also need to satisfy due process.  See Shapiro, 930 F.2d at 1020 (applying minimum contacts due process standard to foreign state); Texas Trading Mill, 647 F.2d 300, 314 (2d Cir. 1981) (establishing that "the safeguards of due process" apply to FSIA cases).  Recently the D.C. Circuit, as well as a California federal district court, have concluded that such "minimum contacts" are not required.  See Price v. Socialist People's Libyan Arab Jamahiriya, 294 F.3d 82, 90 (D.C. Cir. 2002) (concluding that under § 1605(a)(7), the only required link between the defendant nation and United States territory is the nationality of the plaintiff, and that § 1605(a)(7) allows personal jurisdiction over defendants even in circumstances that do not satisfy the "minimum contacts" test of the Due Process Clause); see also Cruz v. United States,

5.   Whether the Assets Belong to Agencies or Instrumentalities of Cuba

Finally, this Court addresses whether the blocked assets in question indeed belong to agencies or instrumentalities of Cuba.   In addition, although Plaintiffs no longer seek turnover from accounts in which Banco Nacional is listed as an owner, JPM Chase has indicated that Banco Nacional may own assets in the other accounts at issue, and Plaintiffs seek turnover of any such amounts allegedly belonging to Banco Nacional.   Thus, in connection with blocked assets belonging to Banco Nacional, this Court addresses whether § 1611 is a bar to attachment.

According to JPM Chase, none of the blocked accounts are in the name of any Judgment Debtor, including the Republic of Cuba.   (See Third-Party Petition of JPMorgan Chase Bank, N.A. under Fed. R. Civ. P. 22, CPLR §§ 5239 & 6221 and Section 134 of the New York Banking Law, dated Sept. 8, 2005 ("JPM Chase Petition"), ¶ 1;  Kerr Decl.  ¶  4;  JPM  Chase  Garnishee

---

387 F. Supp. 2d 1057, 1067 (N.D. Cal. 2005) (applying Price's reasoning to agencies and instrumentalities of a foreign state).  The Supreme Court has not decided this issue, but has signaled that the approach established by the Second Circuit in Texas Trading may be incorrect because foreign states may not be persons under the Due Process Clause.  See Republic of Argentina v. Weltover, Inc., 504 U.S. 607, 619 (1992) ("[a]ssuming, without deciding, that a foreign state is a 'person' for purposes of the Due Process Clause," and citing to South Carolina v. Katzenbach, 383 U.S. 301, 323-324 (1966), which held that states are not "persons" for purposes of the Due Process Clause).  See generally Joseph W. Glannon & Jeffrey Atik, Politics and Personal Jurisdiction: Suing State Sponsors of Terrorism under the 1996 Amendments to the Foreign Sovereign Immunities Act, 87 Georgetown L.J. 675 (1999) (concluding that there is no constitutional impediment to the exercise of personal jurisdiction contemplated by the 1996 amendments to the FSIA).

Statement.)  Instead, the accounts are opened for the benefit of, or to hold payments to or for the account of, various Cuban agencies and instrumentalities. (<u>See</u> JPM Chase Petition ¶ 1; Kerr Decl. ¶ 4.)  The FSIA defines an agency or instrumentality of a foreign state to mean

> any entity–
>
> (1) which is a separate legal person, corporate or otherwise, and
>
> (2) which is an organ of a foreign state or political subdivision thereof, or a majority of whose shares or other ownership interest is owned by a foreign state or political subdivision thereof, and
>
> (3) which is neither a citizen of a State of the United States as defined in section 1332(c) and (e) of this title, nor created under the laws of any third country.

28 U.S.C. § 1603(b).

### i.    *The EMTELCUBA Account*

According to Plaintiffs, the funds in the EMTELCUBA Account consist of settlement payments owed by AT&T to EMTELCUBA, and no other party has any known claim to these funds. (<u>See</u> R. 56.1 Statement ¶ 48 (citing Answer and Defenses of AT&T Corp. to Third-Party Petition in Interpleader of JPMorgan Chase Bank, N.A., dated Oct. 28, 2005 ("AT&T Answer"), ¶ 30.))  JPM Chase has not contested this statement. AT&T admits that it deposited funds in the EMTELCUBA Account that represent settlement payments owed to EMTELCUBA. (AT&T Answer ¶ 30.)

-78-

Plaintiffs contend that EMTELCUBA is an agency or instrumentality of the Republic of Cuba based on (1) the Eleventh Circuit's purported previous characterization of EMTELCUBA as an alter ego of the Cuban Government's Ministry of Communications in the <u>Alejandre</u> case; and (2) EMTELCUBA's admission in the <u>Alejandre</u> case that it is an agency or instrumentality of the Republic of Cuba.

The Eleventh Circuit did not find that EMTELCUBA was indeed an alter ego of the Republic of Cuba or the Cuban Government's Ministry of Communications. Rather, it merely assumed such point for purposes of analyzing whether another entity that succeeded to EMTELCUBA's contracts was an agency or instrumentality of Cuba and liable for Cuba's debts. <u>See</u> <u>Alejandre</u>, 183 F.3d at 1280 n.7 ("In order to facilitate our analysis of this case, we assume <u>arguendo</u> that EMTELCUBA is not a juridical entity separate from the Cuban Government's Ministry of Communications."). However, the Circuit Court noted that the record strongly supported such characterization.[30]

---

[30] The evidence that the Court in <u>Alejandre</u> looked to as supporting the characterization of EMTELCUBA as an entity not juridically separate from Cuba consisted of: (1) documentation indicating that EMTELCUBA is a national directorate of the the Ministry of Communications under its oversight and control; (2) a Ministry press release announcing operating agreements between carriers and "EMTELCUBA, of the Ministry of Communications"; (3) that when Cuba unilaterally deprived EMTELCUBA of its business by granting another entity an exclusive telephone operating concession, and the ministry transferred facilities and equipment to that entity, it was unclear whether EMTELCUBA was compensated separately from the Ministry; (4) licenses from the Office of Foreign Assets Control

As for EMTELCUBA's purported admission that it is an agency or instrumentality of Cuba, EMTELCUBA stated in briefing submitted in the <u>Alejandre</u> case that it fell within the FSIA's statutory definition of agency or instrumentality because more than 50% of its ownership interests are owned by the Republic of Cuba.  (<u>See</u> Brief of RADIOCUBA and EMTELCUBA submitted in <u>Alejandre v. Republic of Cuba</u>, No. 96-10126-CIV-King (S.D. Fla. 1996), dated May 7, 1999 ("RADIOCUBA/EMTELCUBA Brief"), attached as Ex. P to Perkins Decl., at 3-4.)  Whether this percentage of ownership interest remains the same today is not apparent to this Court.

In addition, Plaintiffs have submitted a letter dated October 10, 2000, from the Executive Office of the President, which indicates that for payment to Cuba judgment creditors in the <u>Alejandre</u> case made under another statute, the Department of the Treasury intended to draw in part on the EMTELCUBA account, as well as portions of the AT&T Long Lines Account believed to represent amounts due to EMTELCUBA.  (<u>See</u> Letter from Jacob J. Lew, Director, Executive Office of the President, Office of Management and Budget, to The Honorable Connie Mack, United States Senate, dated October 10, 2000

referencing "<u>Cuba's</u> share of compensation due for its portion of the jointly provided international telecommunications service"; and (5) that such licenses contained a clause describing deductions from payments for telecommunications services "owed <u>to Cuba</u>" under the operating agreement negotiated between the carrier and EMTELCUBA.  <u>Id.</u>

("Exec. Ltr."), attached as Ex. A to Reply Declaration of James W. Perkins in Support of Motion for Partial Summary Judgment, dated Apr. 14, 2006.)  The Court credits this as further evidence supporting a finding that EMTELCUBA is a agency or instrumentality of Cuba.

        In assessing whether these entities are agencies or instrumentalities of Cuba, the Court is "mindful that the instrumentality and its related government -- not the plaintiff -- will frequently possess most of the information needed to [make this determination].  These foreign entities obviously have little incentive to provide information that will help the plaintiff's case, and it may be difficult for the plaintiff to obtain discovery from them." Alejandre, 183 F.3d at 1285 n.19.  The Eleventh Circuit's words were addressed to analyzing whether an agency should be considered juridically separate from the foreign state, but the same reasoning holds true for assessing whether an entity is an agency or instrumentality of a foreign state.  Moreover, following a default all factual allegations in the complaint other than those related to damages are accepted as true. See Cotton v. Sloane, 4 F.3d 176, 181 (2d Cir. 1993); Alejandre v. Republic of Cuba, 996 F. Supp. 1239, 1243 (S.D. Fla. 1997) ("Because Cuba has presented no defense, the Court will accept as true Plaintiffs' uncontroverted factual allegations.").  In

light of EMTELCUBA's having been given notice of this proceeding, the Court credits Plaintiffs' evidence and finds that EMTELCUBA is an agency or instrumentality of Cuba, and thus that Plaintiffs may execute upon the blocked assets of EMTELCUBA.

JPM Chase has indicated that RADIOCUBA may also have an interest in this account and has attempted to bring RADIOCUBA before this Court.  According to papers filed in the Alejandre case and relied on by Plaintiffs, in 1995, EMTELCUBA was dissolved and its assets transferred to RADIOCUBA.  (See RADIOCUBA/EMTELCUBA Brief at 4.)  In addition, according to these papers, RADIOCUBA also comes within the definition of an "agency or instrumentality" in that more than 50 percent of its ownership interests are owned by the Republic of Cuba. (Id.)  In light of the absence of evidence to the contrary, this Court finds that to the extent these same blocked assets belong to RADIOCUBA, Plaintiffs may execute upon them.

Finally, JPM Chase has indicated that ETECSA may have succeeded to certain contractual rights of EMTELCUBA or RADIOCUBA, including claims to the blocked deposits.  JPM Chase suggests that ETECSA is an indirect subsidiary of a foreign state, in that it is owned by several Cuban companies

that are in turn owned or controlled by Cuba.[31]   Under <u>Dole Food Company v. Patrickson</u>, 538 U.S. 468 (2003), a subsidiary of an instrumentality of a foreign state is not itself entitled to instrumentality status under the FSIA.  <u>See</u> <u>id.</u> at 473.  Instead, only direct ownership of a majority of shares by the foreign state satisfies the FSIA's definition of instrumentality as an entity a "majority of whose shares or other ownership interest is owned by a foreign state or political subdivision thereof."  28 U.S.C. § 1603(b)(2); <u>see</u> <u>Dole Food Co.</u>, 538 U.S. at 473.  However, JPM Chase has not offered any evidence that ETECSA is the owner of the assets at issue, other than to state that "[a]t the present time, it is unknown whether ETECSA succeeded to any contractual rights of EMTELCUBA or RADIOCUBA, including any claims to the blocked deposits as to which either of them have a claim."  (Kerr Decl. ¶ 18(e) n.5).  ETECSA has been served but has not appeared.  Accordingly, this Court finds no basis in the record from which to make a finding that ETECSA, rather than EMTELCUBA, owns these assets.

### ii.  *The AT&T Long Lines Account*

According to Plaintiffs, the funds in the AT&T Long Lines

---

[31] JPM Chase describes ETECSA as being owned by three Cuban companies, a Dutch subsidiary of a publicly owned Italian company, and a Panamanian company.  (<u>See</u> Kerr Decl. ¶ 18(e) n.5.)  It does not put forth evidence that the three Cuban companies are in turn owned or controlled by Cuba, but as demonstrated by such argument apparently believes this to be the case.

Account were deposited by AT&T and consist of (a) amounts owed by CATT (a wholly-owned Cuban subsidiary of AT&T) to EMTELCUBA for telecommunications settlement payments, (b) amounts owed by CATT to the Republic of Cuba for taxes, and (c) amounts owed by AT&T to CATT. (See R.56.1 Statement ¶ 52.) The Court has not been presented with any evidence to the contrary and notes that AT&T and CATT admit that such funds have been so deposited. (See AT&T Answer ¶ 33; Answer and Defenses of Cuban American Telephone and Telegraph Company to Third-Party Petition in Interpleader of JPMorgan Chase Bank, N.A., dated Oct. 28, 2005, ¶ 33.) Plaintiffs do not seek turnover of the amounts claimed by CATT or AT&T.

As indicated above, there is sufficient evidence in the record of this default proceeding to conclude that EMTELCUBA is an agency or instrumentality of Cuba. Accordingly, Plaintiffs may execute upon amounts owed to both the Republic of Cuba and to EMTELCUBA.

### iii. *The Rabinowitz Boudin Account*

Plaintiffs assert that Rabinowitz Boudin is holding money in the Rabinowitz Boudin account on behalf of or in trust for the judgment debtors and/or their agencies or instrumentalities. JPM Chase's third-party petition for interpleader relief names Rabinowitz Boudin in its capacity as alleged fiduciary in respect of this account. Rabinowitz

Boudin has not appeared in this action to identify on whose behalf it holds the deposits credited to this account.

According to Plaintiffs, the funds in the Rabinowitz Boudin Account are held by Rabinowitz Boudin as trustee for the account of the Republic of Cuba and its agencies and instrumentalities, including but not limited to Banco Nacional.  (See R.56.1 Statement ¶ 51.)  Plaintiffs have submitted documentation submitted in the Alejandre litigation consisting of (a) an affidavit by a Rabinowitz Boudin attorney indicating that the account is a fiduciary account maintained by the firm  for deposit of litigation recoveries and that funds in the account consist of litigation recoveries owed to Banco Nacional, other Cuban juridical entities owned or controlled by Cuba, and the Republic of Cuba and other Cuban parties, except for approximately $20,000 in the account in 1963 when the Cuban Assets Control Regulations were promulgated; (b) an affidavit by an accountant retained by Rabinowitz Boudin indicating that the funds in such account in large part consist of recoveries owed to Banco Nacional, with some portion of these recoveries potentially owed to CUBAEXPORT; and (c) an affidavit from the Secretary and principal counsel of Banco Nacional indicating that the recovered funds in such account are owned by Banco Nacional and not CUBAEXPORT.  (See Perkins Decl. Exs. Q, R, S

-85-

(submitted in <u>Alejandre v. Republic of Cuba</u>, No. 96-10126-CIV-King (S.D. Fla. 1996)).)

JPM Chase has named Rabinowitz Boudin in its capacity as alleged fiduciary in respect of this account, and contends that Rabinowitz Boudin has opened this account as an attorney trust account.  (<u>See</u> JPM Chase Petition ¶¶ 18, 25.)

JPM Chase, relying on the same submissions made in the <u>Alejandre</u> case, agrees that Banco Nacional is the beneficial owner of most of the funds in the Rabinowitz Boudin Account and also notes based on these submissions that CUBAEXPORT, described as a Cuban state trading corporation, may also have an interest in some portion of the Rabinowitz Boudin Account. (<u>See</u> Kerr Decl. ¶ 18(b),(c).)   However, JPM Chase also contends that Rabinowitz Boudin, as an alleged fiduciary in respect of this account, is the party in the best position to identify on whose behalf it holds funds in that account. (<u>See</u> JPM Chase Petition ¶ 28.)

The Court also takes note that the October 2000 letter from the Executive Office of the President indicates that for payment to the Cuba judgment creditors in the <u>Alejandre</u> case, the Department of the Treasury also intended to draw on the Rabinowitz Boudin Account.  (<u>See</u> Exec. Ltr.)

Banco Nacional is apparently the central bank of the Republic of Cuba. (<u>See</u> R. 56.1 Statement ¶ 50.)  JPM Chase

states that Banco Nacional is "engaged in central banking activities" and is an agency or instrumentality within the meaning of the FSIA.  (Kerr Decl. ¶ 18(b).)  The Second Circuit has stated that "[s]tate-owned central banks indisputably are included in the § 1603(b) definition of 'agency or instrumentality.'" S & S Machinery, 706 F.2d at 414.  Plaintiffs point out that other courts have recognized both Banco Nacional and CUBAEXPORT as "two Cuban government corporations" and "wholly owned corporations of the Government of Cuba."  See Dean Witter Reynolds, Inc. v. Fernandez, 741 F.2d 355, 356, 357 (11th Cir. 1984).  In addition, at least one other court in this district has described Banco Nacional as an instrumentality of Cuba.  See Banco Nacional de Cuba v. Chemical Bank New York Trust Co., 594 F. Supp. 1553, 1556 (S.D.N.Y. 1984).[32]

On this record, the Court is persuaded that to the extent the funds in the Rabinowitz Account belong to Banco Nacional or to CUBAEXPORT, they belong to agencies or instrumentalities of Cuba and Plaintiffs may execute upon them to satisfy their judgment against Cuba.

---

[32] Plaintiffs also contend that Banco Nacional represented in briefs submitted in the Alejandre case that it comes within the FSIA's definition of an agency or instrumentality, but Plaintiffs have not attached such briefs to their papers here.  Plaintiffs' memorandum directs the Court to Exhibit P of the Perkins Declaration, but Exhibit P contains a brief by RADIOCUBA and EMTELCUBA in the Alejandre case, not a brief by Banco Nacional.

Finally, FSIA § 1611 presents no impediment to execution.

§ 1611(b) provides that:

Notwithstanding the provisions of section 1610 of this chapter, the property of a foreign state shall be immune from attachment and from execution, if-

(1) the property is that of a foreign central bank or monetary authority held for its own account, unless such bank or authority, or its parent foreign government, has explicitly waived its immunity from attachment in aid of execution, or from execution, notwithstanding any withdrawal of the waiver which the bank, authority or government may purport to effect except in accordance with the terms of the waiver; or

(2) the property is, or is intended to be, used in connection with a military activity and

(A) is of a military character, or
(B) is under the control of a military authority or defense agency.

28 U.S.C. § 1611(b).  TRIA § 201(a) is appended to § 1610, which provides the sole bases for exceptions to immunity from execution of property.  Section 1611(b) in turn states that a foreign central bank's property is immune "[n]otwithstanding the provisions of 1610."  Notably, § 1611(b) lists certain exceptions to this immunity -- such as waiver -- that are found in § 1610(a), but it does not list exceptions based on terrorism.  Plaintiffs argue that § 1611(b) presents no impediment to execution because TRIA § 201(a)'s provisions apply "notwithstanding any other provision of law."  TRIA § 201(a), codified at § 1610 note.  As previously noted, the intent of the "notwithstanding" language in TRIA is "to target

-88-

statutory exceptions to immunity," <u>Holy Land Found.</u>, 445 F.3d
at 787, and "to the extent that a foreign country's sovereign
immunity potentially conflicts with Section 201(a), the
'notwithstanding' phrase removes the potential conflict."
<u>Smith</u>, 280 F. Supp. 2d at 319, <u>judgment</u> <u>aff'd</u>, 346 F.3d 264
(2d Cir. 2003). Accordingly, TRIA, which was enacted later in
time than § 1611, overrides the immunity conferred in § 1611.

C.   <u>TURNOVER PURSUANT TO CPLR § 5225(b)</u>

Rule 69 of the Federal Rules of Civil Procedure
authorizes use of state law procedure for enforcement of a
judgment, subject to any governing federal law. <u>See</u> Fed. R.
Civ. P. 69. Plaintiffs seek turnover pursuant to CPLR §
5225(b). That section provides for enforcement of money
judgments through property not in the hands of the judgment
debtor:

> Upon a special proceeding commenced by the judgment
> creditor, against a person in possession or custody of
> money or other personal property in which the judgment
> debtor has an interest, or against a person who is a
> transferee of money or other personal property from the
> judgment debtor, where it is shown that the judgment
> debtor is entitled to the possession of such property or
> that the judgment creditor's rights to the property are
> superior to those of the transferee, the court shall
> require such person to pay the money, or so much of it as
> is sufficient to satisfy the judgment, to the judgment
> creditor and, if the amount to be so paid is insufficient
> to satisfy the judgment, to deliver any other personal
> property, or so much of it as is of sufficient value to
> satisfy the judgment, to a designated sheriff. Costs of
> the proceeding shall not be awarded against a person who
> did not dispute the judgment debtor's interest or right
> to possession. Notice of the proceeding shall also be

served upon the judgment debtor in the same manner as a summons or by registered or certified mail, return receipt requested. The court may permit the judgment debtor to intervene in the proceeding. The court may permit any adverse claimant to intervene in the proceeding and may determine his rights in accordance with section 5239.

NY C.P.L.R. § 5225(b).

Here, JPM Chase and Rabinowitz Boudin are each "a person in possession or custody of money or other personal property" in which the evidence has demonstrated the judgment debtors have an interest. One of the named judgment debtors is Cuba; by operation of TRIA, Cuba's agencies and instrumentalities also become the judgment debtors, and as set forth above, the evidence has demonstrated that these agencies and instrumentalities have an interest in the accounts. In addition, some evidence indicates that Cuba itself has an interest in the property -- namely, in the AT&T Long Lines Account, CATT has indicated that some deposits in that account consist of amounts owed by CATT to the Republic of Cuba. The judgment debtors are "entitled to possession of such property" except for the blocked nature of the accounts. However, the U.S. Department of Justice has indicated that "[i]n the event the Court determines that the funds are subject to TRIA, the funds may be distributed without a license from the Office of Foreign Assets Control." (DOJ Ltr.) Accordingly, under CPLR § 5525(b) such property may be used to satisfy Plaintiffs'

judgments.

D.   JPM CHASE'S MOTION FOR INTERPLEADER RELIEF

    1.   Interpleader Relief

JPM Chase has moved for discharge in interpleader pursuant to Federal Rule of Civil Procedure 22,[33] as well as discharge pursuant to CPLR §§ 5209 and 5239.

In relevant part, Rule 22 provides: "Persons having claims against the plaintiff may be joined as defendants and required to interplead when their claims are such that the plaintiff is or may be exposed to double or multiple liability.... A defendant exposed to similar liability may obtain such interpleader by way of cross-claim or counterclaim." Fed. R. Civ. P. 22(1).

"Rooted in equity, interpleader is a handy tool to protect a stakeholder from multiple liability and the vexation of defending multiple claims to the same fund." Washington Elec. Coop., Inc. v. Paterson, Walke & Pratt, P.C., 985 F.2d 677, 679 (2d Cir. 1993). "[W]hat triggers interpleader is 'a real and reasonable fear of double liability or vexatious, conflicting claims.'" Id. (quoting Indianapolis Colts v. Mayor of Baltimore, 741 F.2d 954, 957 (7th Cir. 1984), cert.

---

[33] Federal procedure provides for both rule interpleader pursuant to Federal Rule of Civil Procedure 22 and statutory interpleader pursuant to 28 U.S.C. § 1335. The two differ in terms of jurisdictional, venue, and other requirements. See 6247 Atlas Corp. v. Marine Ins. Co., Ltd., 155 F.R.D. 454, 461 (S.D.N.Y. 1994).

denied, 470 U.S. 1052 (1985)).  Accordingly, under Rule 22, interpleader is proper if the party requesting it "is or may be exposed to double or multiple liability." Fed. R. Civ. P. 22(1); Washington Elec. Coop., 985 F.2d at 679.  As a remedial joinder device, interpleader is to be liberally construed. See State Farm Fire & Cas. Co. v. Tashire, 386 U.S. 523, 533 (1967); 6247 Atlas Corp. v. Marine Ins. Co., 155 F.R.D. 454, 461 (S.D.N.Y. 1994) (both rule and statutory interpleader should be liberally construed).

Interpleader "prevents the stakeholder from being obliged to determine at his peril which claimant has the better claim, and when the stakeholder has no interest in the fund, forces the claimants to contest what essentially is a controversy between them without embroiling the stakeholder in the litigation over the merits of the respective claims." 7 Wright, Miller & Kane, Federal Practice and Procedure § 1702 at 534 (3d ed. 2001).  Thus, Rule 22 "is designed to insulate a stakeholder from contradictory judgments and multiple liability and to relieve a stakeholder from having to determine which claim among several is meritorious." John v. Sotheby's, Inc., 141 F.R.D. 29, 33 (S.D.N.Y. 1992).

Interpleader litigation usually proceeds in two stages, the first determining whether interpleader is appropriate relief, and the second adjudicating the adverse claims.  See

<u>New York Life Ins. Co. v. Connecticut Dev. Auth.</u>, 700 F.2d 91, 95 (2d Cir. 1983). "[T]his bifurcation is not mandatory, however, and the entire action may be disposed of at one time." <u>Id.</u> Here, the Court must simultaneously determine JPM Chase's entitlement to interpleader relief and adjudicate the adverse claims of the interpleaded defendants, because only if execution is authorized by TRIA, as determined by this Court, can the blocked deposits that are subject to turnover be paid into the Court's registry, and only then will the need for discharge of JPM Chase be presented. As set forth above, this Court has found that TRIA authorizes execution of these assets, and the Court now assesses JPM Chase's right to relief in the nature of interpleader.

As indicated, Rule 22 allows for interpleader where the party is requesting it "is or may be exposed to double or multiple liability." Fed. R. Civ. P. 22(1); <u>Washington Elec. Coop.</u>, 985 F.2d at 679; <u>see</u> <u>6247 Atlas Corp.</u>, 155 F.R.D. at 462 (interpleader appropriate where stakeholder "legitimately fears" multiple liability). Here, JPM Chase contends that it is at risk of multiple liability and inconsistent legal obligations because Plaintiffs seek to execute against the blocked assets of juridically separate entities not previously sued or found liable for the acts in question, and in addition because it suggests that the jurisdictional basis for the

original state court default judgments requires examination.

JPM Chase has identified a number of parties, in addition to Weininger and McCarthy, as having viable claims to the blocked assets. JPM Chase has alleged, upon information and belief, that the funds in the EMTELCUBA Account consist of payments made by AT&T to EMTELCUBA. (See JPM Chase Petition, ¶ 30.) AT&T admits that the funds it deposited into that account represented payments owed by AT&T to EMTELCUBA. (See AT&T Answer, ¶ 30.) As discussed above, RADIOCUBA may also have an interest in the EMTELCUBA Account, to the extent that it succeeded to the assets of EMTELCUBA.

According to JPM Chase, AT&T established the AT&T Long Lines Account to deposit monies it owed to Cuban entities, including CATT, EMTELCUBA, RADIOCUBA and possibly ETECSA. (See JPM Chase Petition, ¶ 33.) AT&T has stated that these funds were deposited by AT&T in satisfaction of amounts owed by CATT to EMTELCUBA, amounts owed by CATT to the Republic of Cuba, and amounts owed by AT&T to CATT, its wholly-owned subsidiary. (See AT&T Answer, ¶ 33.) Pursuant to an agreement with AT&T and CATT, Plaintiffs have agreed not to seek turnover of amounts owed by AT&T to CATT, on the basis that such funds are not the property of the Republic of Cuba or its agents or instrumentalities.

Finally, with respect to the Rabinowitz Boudin Account,

JPM Chase alleges that the account was opened by Rabinowitz Boudin for deposit of recoveries in lawsuits on behalf of the Republic of Cuba and its agents and instrumentalities, including Banco Nacional and CUBAEXPORT.   (See JPM Chase Petition, ¶¶ 25-26.)   These allegations are supported by submissions made in the Alejandre case, as discussed above.

In light of these allegations, the Court finds that JPM Chase faces a reasonable fear of double liability or conflicting claims, and that relief by way of interpleader is warranted with respect to the EMTELCUBA Account, the AT&T Long Lines Account, and the Rabinowitz Boudin Account, with the exception of the portion of the AT&T Long Lines Accounts to which Plaintiffs have voluntarily excluded from their claims (approximately $6,332.843.49 as of September 30, 2005, plus any additional interest accruing thereon from September 30, 2005 up to the date of turnover to Plaintiffs).   (See Stipulation of Agreement and Order Concerning Certain Funds in the Blocked Accounts, filed April 10, 2006 (Docket No. 152).)

2.   Attorney's Fees and Costs

JPM Chase has also requested reasonable costs, expenses, and attorney's fees in an amount to be specified in an application submitted under Federal Rule of Civil Procedure 54.   Attorney's fees and costs are generally awarded to a disinterested stakeholder who has "expended time and money

participating in a dispute 'not of his own making and the outcome of which has no impact on him.'" Fidelity Brokerage Services, LLC v. Bank of China, 192 F.Supp.2d 173, 183 (S.D.N.Y. 2002) (quoting Companion Life Ins. Co. v. Schaffer, 442 F.Supp. 826, 830 (S.D.N.Y. 1977)); Sparta Florida Music Group, Ltd. v. Chrysalis Records, Inc., 566 F.Supp. 321, 322 (S.D.N.Y. 1983); see also Septembertide Publ'g, B.V. v. Stein & Day, Inc., 884 F.2d 675, 683 (2d Cir. 1989) ("A disinterested stakeholder who asserts interpleader is entitled to be awarded costs and attorney's fees."). Because JPM Chase meets these criteria, the Court grants it reasonable attorney's fees and costs, subject to an application to the Court in accordance with Rule 54.

The Court notes, however, that JPM Chase's lititation strategy, to the extent that it advocated a position agianst Plaintiffs, went beyond that of a typical disinterested stakeholder, whose legal expenses are associated merely with its efforts to secure interpleader. See 7 Wright, Miller & Kane, Federal Practice and Procedure § 1719 at 686-87 (3d ed. 2001) ("In the usual case the [attorney's] fee will be relatively modest, inasmuch as all that is necessary is the preparation of a petition, the deposit in court or posting of a bond, service on the claimants, and the preparation of an order discharging the stakeholder."). To this extent, JPM

Chase's entitlement to attorney's fees may be adjusted.

Attorney's fees and costs "are generally awarded against the interpleader fund, but may, in the discretion of the court, be taxed against one of the parties when their conduct justifies it." Septembertide, 884 F.2d at 683.  In this case, no claimant has exhibited behavior justifying such a decision by the Court, and therefore JPM Chase's attorney's fees and costs will be awarded against the interpleader fund, to be divided between the claimants on a pro rata basis.

### IV.  ORDER

For the reasons set forth above, it is hereby

**ORDERED** that the motions (Docket Nos. 122 and 124) for partial summary judgment on claims for turnover order of plaintiffs Janet Ray Weininger ("Weininger") and Dorothy Anderson McCarthy ("McCarthy") are GRANTED; and it is further

**ORDERED** that the cross motion (Docket No. 143) for relief in the nature of interpleader of JPMorgan Chase Bank, N.A. ("JPM Chase") is GRANTED; and it is further

**ORDERED** that judgment be entered in favor of Weininger and against JPM Chase and Rabinowitz, Boudin, Standard, Krinsky & Lieberman, P.C. ("Rabinowitz Boudin"), in their capacities as garnishees, directing JPM Chase and Rabinowitz Boudin to turn over to the United States Marshal, the entire

-97-

balance of the following accounts: (1) AT&T Long Lines
(Account No. G00875) (less the portion of this account that
Plaintiffs have voluntarily excluded from their claims --
approximately $6,332.843.49 as of September 30, 2005, plus any
additional interest accruing thereon from September 30, 2005),
(2) Rabinowitz Boudin Republic of Cuba (Account No. 092-
6371190); and (3) Empresa de Telecomunicaciones de Cuba
(Account No. 395-507995), not to exceed in total the sum of
twenty-three million, nine hundred thirty-nine thousand, three
hundred one dollars and ninety-five cents ($23,939,301.95),
with interest thereon from December 13, 2005, to be calculated
by the Clerk of Court, plus costs and disbursements to be
taxed by the Clerk of Court, less a pro rata share of any
reasonable attorney's fees and costs granted to JPM Chase by
the Court on separate application; and it is further

**ORDERED** that judgment be entered in favor of McCarthy and
against JPM Chase and Rabinowitz Boudin, in their capacities
as garnishees, directing JPM Chase and Rabinowitz Boudin to
turn over to the United States Marshal, the entire remaining
balance of the following accounts: (1) AT&T Long Lines
(Account No. G00875) (less the portion of this account that
Plaintiffs have voluntarily excluded from their claims --
approximately $6,332.843.49 as of September 30, 2005, plus any
additional interest accruing thereon from September 30, 2005),

(2) Rabinowitz Boudin Republic of Cuba (Account No. 092-6371190); and (3) Empresa de Telecomunicaciones de Cuba (Account No. 395-507995), not to exceed in total the sum of sixty-seven million dollars ($67,000,000), with interest thereon from February 2, 2005, to be calculated by the Clerk of Court, plus costs and disbursements to be taxed by the Clerk of Court, less a pro rata share of any reasonable attorney's fees and costs granted to JPM Chase by the Court on separate application; and it is further

**ORDERED** that within five (5) business days of service of this Order, JPM Chase turn over the funds specified above to the Marshal; and it is further

**ORDERED** that within fourteen (14) days of service of this Order, JPM Chase submit a detailed accounting of its attorney's fees and costs in an application to the Court pursuant to Federal Rule of Civil Procedure 54; and it is further

**ORDERED** that Weininger and McCarthy may respond to such application within ten (10) days of its filing, unless within such time the parties stipulate to an amount of attorney's fees and costs for the Court's endorsement; and it is further

**ORDERED** that within five (5) business days of service of an order by the Court ruling on JPM Chase's application for

attorney's fees and costs, the Marshal shall transfer such funds to Weininger and McCarthy in accordance with such payment instructions as may be provided jointly by counsel of record for Weininger and McCarthy; and it is further

**ORDERED** that, upon compliance with this Order, garnishee/respondent/third-party petitioner JPM Chase and garnishee/respondent Rabinowitz Boudin shall be fully discharged pursuant to CPLR §§ 5209 or 6204, as applicable, from any and all deposit obligations or other liabilities to the Republic of Cuba, to the agency or instrumentality of the Republic of Cuba otherwise entitled to claim the deposit, or adverse claimant-respondent to the full extent of such amount so held and paid to the Marshal in accordance with this Order, and that each and every party to this proceeding is hereby restrained and enjoined from instituting or prosecuting any claim or action against JPM Chase and/or Rabinowitz Boudin in any jurisdiction arising from or relating to any claim to the blocked assets which JPM Chase and Rabinowitz Boudin turn over to the Marshal in compliance with this Order.

The Clerk of Court is directed to close this case, subject to its being reopened for the purpose of considering any application for reasonable attorney's fees and costs as provided herein.

-100-

**SO ORDERED.**

Dated:     New York, New York
           17 November 2006

_____

VICTOR MARRERO
U.S.D.J.